[No. 17551.    Department Two.    May 11, 1923.]

## HANS HEIDNER, *Appellant*, v. ST. PAUL & TACOMA LUMBER COMPANY, *Respondent*.[1]

PRINCIPAL AND AGENT (9)—EVIDENCE OF RELATION—SUFFICIENCY. A resident agent is sufficiently shown to have been representing a German concern in making a contract in his own name, where he asked a lumber company to book the concern's order for the lumber, which he did on request of the concern for whom he had previously acted as agent.

WAR (3)—EFFECT OF WAR—ALIEN ENEMIES—PRE-EXISTING CONTRACTS—ANNULMENT—PUBLIC POLICY. A contract for the manufacture and sale of lumber for export to Germany, made and entered into on behalf of a citizen of Germany, before our war with that country, was annulled by the declaration of war, since it became impossible of performance within a reasonable time and was against public policy; and this is so under the common law, regardless of whether the lumber company gave due notice to the Federal alien property custodian of the abrogation of the agreement, as required by the "Trading with the Enemy Act," 40 Stat. at Large 411, § 8.

Appeal from a judgment of the superior court for Pierce county, Askren, J., entered May 16, 1922, upon findings in favor of the defendant, in an action on contract, tried to the court. Affirmed.

*C. E. Stevens* and *Chas. A. Wallace,* for appellant.

*Herbert S. Griggs* and *L. R. Bonneville,* for respondent.

PARKER, J.—The plaintiff Heidner, a resident of Tacoma, in this state, and a citizen of the United States, commenced this action in the superior court for Pierce county, seeking recovery of damages for an alleged breach of a contract he claims to have entered into in his own behalf as principal with the defendant lumber company in December, 1915, for the purchase of 500,000 feet of lumber to be manufactured and de-

'Reported in 215 Pac. 1.

livered by the lumber company in about six months, "f. a. s. steamer or vessel Tacoma Harbor," for shipment to F. A. Sohst at Hamburg, Germany, while the world war between Germany and other European powers was in progress, or later, if such shipment be "still impossible on account of the war." None of the lumber being so furnished, Heidner claims damages from the lumber company measured by the amount he paid in advance upon the contract and the difference between the contract price and the market value of the lumber at the time of the alleged breach of the contract by the lumber company. Trial of the case upon the merits before the court sitting without a jury, resulted in findings and judgment being made and rendered by the court denying to Heidner recovery in any amount, from which he has appealed to this court.

The trial court so disposed of the case upon the theory that the contract was entered into by Heidner for and on behalf of F. A. Sohst, a business concern of Hamburg and a citizen of Germany; that the contract, in legal effect, became an alien enemy contract upon the entrance of the United States into the world war against Germany, it then remaining practically wholly executory; and that therefore, by operation of the law relating to trading with the enemy, it became dissolved and of no further binding force upon anyone; and that the lumber company had tendered return of the payments which had been advanced to it upon the contract, and kept such tender good by bringing the amount thereof into court upon the filing of its answer in the case.

While the record before us does not render plain the legal status of the entity called "F. A. Sohst", there is enough therein to show that such is the name of a large business concern having its principal place of

business at Hamburg, Germany, and that such concern is either an individual who has at all times in question been a citizen of Germany, a partnership the members of which have been such citizens, or a corporation that has been such citizen. We shall hereafter refer to this concern as Sohst. During all times in question, Heidner has been engaged in the export and import business at Tacoma, acting at times on his own account and at other times as agent for Sohst and others. During a period of some five years or more next preceding the making of the contract in question, the lumber company had made numerous sales and shipments of lumber to Sohst at Hamburg. These sales and shipments were practically all negotiated through Heidner as the local representative of Sohst. On August 25, 1915, Sohst wrote to Heidner in part as follows:

"Although naturally there not yet any definite signs that the situation of the war can be viewed, I however believe that the time approaches when one must look into the future, and sooner or later this terrible war must come to an armistice and final peace.

". . . I believe it to be time to think again of purchases.

"As you know even in former times we covered 6-8 months in advance, because this time is used for the cutting and sticking of the merchandise, and before one finds opportunity to ship, also months may pass.

"We now must find out, if the mills friendly to us are willing to take orders, the cutting of which can start in January/February 1916. . . .

"The inquiry for the planks I request you, if in any way possible, to give only to the St. Paul and Tacoma Lumber Co., and the deckplanks possibly only Bolcom and St. Paul & Tacoma Lumber Co. These people of course must obligate themselves, to let the merchandise lay on sticks about 3 months exactly as formerly. If then the relations are not yet cleared, one can then pay them for the merchandise and let it lay further at the sawmills. I request you to inquire and to write me

about it. I will then give you prompt answer by letter."

On September 23, 1915, Heidner, answering that letter, wrote to Sohst in part as follows:

"I am referring to your letter of Aug. 25th.

"The St. Paul Mill is ready to cut
     Deckings at $30.—
     Planks  "  20.—
during the winter, to stick the lumber, and to wait 6 months (from date of order) with the delivery, and if same then cannot be taken, a payment of 75% would be necessary, against which the mill would further hold the lumber and cover the fire insurance for same.

". . . I did not tell that the lumber is destined for you, but Mr. Griggs can easily imagine it. He also told me that he will complete slowly your old order which you placed before the war. . . .

"I believe that the St. Paul Mill will finally take your new order . . .

"Please let me know soon what you want to undertake . . ."

On October 29, 1915, answering that letter, Sohst wrote to Heidner in part as follows:

"I am referring today to your letter of Sept. 23rd and request you to close with the St. Paul & Tacoma mill on basis of your details . . .

"Should the war still last unduly long, and the bad Mark exchange still continue during the next year, we can, according to my opinion, get around that, by your taking up for me a credit over there in form of an acceptance, against which I eventually deposit securities. . . .

"Naturally I would prefer if the cutting would start as late as possible. Further instructions I do not have to give you as you know exactly how the entire matter hangs together."

This correspondence between Heidner and Sohst probably was not shown to any of the officers of the lumber company, and of course forms no part of the

contract in question. We quote from it here as shedding light upon the question of Heidner's acting for Sohst in the making of the contract. On December 1st, manifestly after the letter of Sohst to Heidner last above quoted from was received by him, he had a conversation with the president of the lumber company wherein they evidently arrived at a tentative agreement which culminated in the following order addressed to the lumber company, and the acceptance thereof by the lumber company:

"Tacoma, Wash., U.S.A., Dec. 3rd, 1915.
"St. Paul & Tacoma Lumber Co.,
"Tacoma, Wash.
"Dear Sirs—Referring to my conversation with your Major Griggs on the 1st inst., wish you would book the following order from F. A. Sohst, Hamburg

. . .

"Lumber to be put on sticks for 60-90 days air-drying before shipped . . .

"Prices per 1000 ft. BM f. a. s. steamer or vessel Tacoma Harbor, less 2½% twice for cash against documents.

"Shipment to be made in about six months, or if still impossible on account of the war, then buyer to advance seller payment of 75% of the lumber actually ready for shipment at the time, or whenever ready thereafter, but seller to carry the fire insurance on the lumber at his expense.

"Please confirm booking of the above order, and oblige,                     Yours very truly,
                              "Hans Heidner."

The omitted portion of this order contains a description of 500,000 feet of lumber proposed to be purchased, and we note that it agrees both in quantity and kind with the description in the last letter of instructions from Sohst to Heidner, above quoted from. It is apparent that this contract contemplated a cash sale and not a sale on credit; that is, a sale for cash at all

events not later than at the time of final delivery of
the lumber. On the prior occasion of similar dealings
between Heidner and the lumber company, the lumber
was loaded on vessels and bills of lading therefor
issued in the name of and delivered to the lumber com-
pany, which, upon being transferred to Heidner, or to
Heidner for Sohst, the whole purchase price was paid.
This, no doubt, is the course contemplated by the words
of this order constituting the contract upon its accept-
ance "for cash against documents." On June 6, 1916,
more than six months after the entering into of the
contract, the lumber company, having cut and air-
dried, ready for shipment as called for in the con-
tract, 84,851 feet of lumber, seventy-five per cent of
the contract price of which amounted to $1,327.89, the
shipment of which lumber to Sohst was "still impos-
sible on account of the war," the lumber company de-
manded of Heidner that this seventy-five per cent of
the contract price of the lumber ready for shipment be
advanced to it as agreed. Two days later Heidner
paid to the lumber company $1,300 by his personal
check, and sometime later in the same manner paid
the balance of $27.89 to the lumber company. Condi-
tions continued, up to the time of the entry of the
United States into the world war, to be such as to
render shipment of any of the lumber to Sohst phys-
ically "impossible on account of the war", so the lum-
ber company did not cut any more lumber looking to
the shipment of it to Sohst in pursuance of the con-
tract. Such were the facts occurring and the condi-
tions existing up to the time the United States entered
the war against Germany in April, 1917. Of course,
thereafter until the close of the war between the United
States and Germany, shipment of any part of the lum-
ber was rendered physically impossible, and also im-

possible without violation of the law relating to trading with enemies, even if shipment had been physically possible. Thereafter the lumber company sent its check for $1,327.89 to Heidner, accompanied by the following letter:

"Tacoma, Wash., Wednesday,
"March 26, 1919.

"Mr. Hans Heidner,
"Tacoma, Wash.

"Dear Sir: Referring to your letter of December 3rd, 1915, ordering Decking and Planks for shipment to Hamburg, Germany. As you probably recall, this stock was to be cut and if shipment was not made within six months after the stock was cut and piled out for air drying, then you were to advance 75% of the mill value.

"As you know, we invoiced you on June 6th, 1916, for 75% of the mill value on 84,861 feet, total invoice of $1,327.89.

"We have considered this order canceled because of the war and did not do anything further towards getting it out as we would have been prohibited from doing so by law and as the lumber which we had gotten out previously would have been worthless by this time, had we permitted it to remain in pile, we have reworked this lumber applying it on other orders. You are therefore entitled to a refund in the amount of our invoice of June 6, 1916, or $1,327.89.

"We are therefore sending you our check herewith for this amount and will consider the order canceled.

"Yours truly,
"A. H. Landram, Sales Manager."

Heidner held this check until about August 1, 1921, when he returned it to the lumber company, and in the latter part of that month commenced this action. Upon the filing of its answer in the case, the lumber company deposited with the clerk of the court the sum of $1,327.89, unconditionally, subject to the order of Heidner, with a view of keeping its tender good, which

sum is still in the hands of the clerk of the court for that purpose. We may add that the lumber company seems to have in form rendered its invoice of June 6, 1916, to Heidner. We also note that the checks given to the lumber company in payment of seventy-five per cent of that invoice were the personal checks of Heidner, and that some of the correspondence from the lumber company relative to the contemplated shipment of the lumber is in form addressed to Heidner. There is some evidence in the record tending to show that Heidner has made some demands upon the lumber company to proceed with the cutting of the lumber, but none of such demands contain any suggestion that he desired the lumber for any purpose other than for its ultimate shipment to Sohst at Hamburg, Germany, as plainly contemplated by the contract when it was made. We think the lumber company did not cease the cutting and preparation of the lumber for that purpose until it became evident that such shipment could not, on account of the war, be made within any reasonable time.

The trial court found in substance that, in the making of the contract looking to the purchase and shipment of the lumber to Sohst, in the preliminary negotiations prior thereto, and in all things done thereafter in connection with the contract, Heidner was acting as agent and in behalf of Sohst; and that his acts and words were at all times, until the controversy arose over the annulling of the contract on account of the war between the United States and Germany, such as to induce the lumber company so to believe. We cannot see our way clear to disturb this conclusion of the trial court upon the question of Heidner's agency for Sohst.

Considerable argument is indulged in on behalf of

counsel for Heidner rested upon the theory of his technical right to seek redress in the courts in his own name rather than in the name of Sohst, because of the contract being in form in his name, because of his personal checks having been received in part payment for the purchase price of the lumber, because of the invoice having been rendered by the lumber company in form in his name, because some correspondence relating to the contract was in form addressed by the lumber company to him, and because, as it is claimed, credit was extended to him and not to Sohst by the lumber company.

We do not think the real question in this case, to wit, whether or not the contract became, upon the commencement of the war between the United States and Germany, an executory alien enemy contract, and as such was in law dissolved and canceled upon the commencement of the war between the United States and Germany, is to be answered by the barren technical test of just who might seek redress in our courts for the enforcement of, or damages for the breach of, the contract. It might be that, because of the terms of such a contract, such a controversy could properly be waged between Heidner and the lumber company, so far as the mere question of parties to such a controversy in the courts is concerned, and the contract still be or become a contract in violation of the law relating to trading with enemies. The fact that the contract may be in form in Heidner's name as a party thereto is, it seems to us, far from becoming a controlling consideration in our present inquiry; and as to the claim of the giving of credit by the lumber company to Heidner instead of Sohst, we think that is of almost no moment here because there was in fact no credit given to anyone, the contract contemplating a

sale for cash, and the full payment of the purchase price of the lumber when delivered.

Of course, this contract was not unlawful within the meaning of the trading with enemies law, at the time it was entered into, the war between the United States and Germany not having then commenced; but we think it plainly was an executory contract and remained such up to and after the time the United States entered the war against Germany. It was practically wholly so because no several part of the delivery of the lumber had occurred before that time. So our problem is, was the contract annulled as to the further performance of its terms by the lumber company? In Huberich on Trading with the Enemy, p. 262, that learned author makes the following observations which seem well supported by the authorities:

"The following classes of contracts are annulled, and not merely suspended:

"1. Contracts requiring uninterrupted intercourse between the parties. 'Executory contracts with an alien enemy, or even with a neutral, if they cannot be performed except in the way of commercial intercourse with the enemy, are dissolved by the declaration of war, which operates for that purpose with a force equivalent to an act of Congress.' Clifford, J., in *Hanger v. Abbott* (1867), 6 Wall. 532, 18 L. ed. 939. See also, *Esposito v. Bowden* (1857), 7 Ellis & B. 763; *Janson v. Driefontein Consolidated Mines* [1902] A. C. 484, 509; *Duncan Fox & Co. v. Schrempft & Bonke* [1915] 1 K. B. 365.

"2. Contracts, the continued existence of which is against public policy. 'It is not competent to any subject to enter into a contract to do anything which may be detrimental to the interests of his own country.' Lord Alvanley, C. J., in *Furtado v. Rogers* (1802), 3 Bos. & P. 191. Therefore, a contract involving a violation of the duties of allegiance is dissolved. *Statham v. New York Life Insurance Co.* (1871), 45 Misc. 581,

·7 Am. Rep. 737. For the same reason contracts of marine insurance are held to be annulled in so far as they insure against capture by the government of the insurer. Applying this rule, it was laid down in *Robson v. Premier Oil and Pipe Line Co.* [1915] 2 Ch. 124, 136, that a transaction between an alien enemy and a British subject which might result in detriment to Great Britain or advantage to the enemy came within the principle upon which intercourse is prohibited, namely, that of public policy. See also Bray, J., in *Tingley v. Muller* [1917] 2 Ch. 144; *Zinc Corporation v. Hirsch* [1916] 1 K. B. 541.

"3. Contracts where time is of the essence of the agreement. Thus, in *New York Life Insurance Co.' v. Statham* (1876), 93 U. S. 24, 24 L. ed. 789, per Bradley, J.: 'The case, therefore, is one in which time is material and of the essence of the contract. Non-payment at the day involves absolute forfeiture, if such be the terms of the contract, as is the case here. Courts cannot with safety vary the stipulation of the parties by introducing equities for the relief of the insured against their own negligence.'

"Time may be of the essence of the contract either under its express terms or from the circumstances of the case, as for example, in an agreement to sell perishable goods or an interest in property of a speculative or wasting nature. Trotter (Supp.) 60.

"4. Contracts a revival of which after the war would be inequitable to either party. 'Where cessation of performance for an indefinite time means commercially speaking, the end of the contract, they (the courts) treat it as dissolved, but where such an interruption of performance does not go to the root of the business then they treat the contract as suspended.' Scott, Trading with the Enemy (2d ed.), 12. 'The doctrine of the revival of contracts suspended during the war, is one based on considerations of equity and justice and cannot be invoked to revive a contract which it would be unjust or inequitable to revive.' Per Bradley, J., in *New York Life Insurance Co. v. Statham* (1876), 93 U. S. 24, 24 L. ed. 789. A contract

is suspended only where the suspension does not involve making a new agreement between the parties. *Distington Haematite Iron Co. v. Possehl & Co.* [1916] 1 K. B. 811.''

It seems to us that the first proposition above quoted is a complete answer to the contention that this contract, in so far as it was unexecuted, and we have seen that it was practically wholly unexecuted, was annulled, releasing all parties from further compliance with its terms, by the commencement of the war between the United States and Germany in April, 1917.   It also seems to us that the second proposition above quoted is equally conclusive against the contentions here made in behalf of Heidner.   Manifestly, it would be against public policy to allow this lumber to be shipped to Sohst, had that been physically possible after the United States entered the war.   It might well be argued that the third and fourth propositions above quoted are also conclusive as against the contentions here made in behalf of Heidner, in view of the fact that the suspension of the contract would necessarily be for an indefinite period, and as actually occurred would have been for a period, we think, quite beyond the time when the contract was contemplated at all events to be fully performed; having in view that it was to be fully performed in about six months, and at all events within a reasonable time thereafter.

The decision of the supreme court of the United States in *New York Life Ins. Co. v. Statham,* 93 U. S. 24, is of particular interest touching the question of annulling of the contract rather than merely its suspension.   In that case there was an attempt to recover upon a life insurance policy issued in 1851 by the insurance company, it being a citizen of the United States and a resident of the state of New York, upon

the life of one Statham, a resident of the state of Mississippi, he having died in 1862 after the state of Mississippi had joined the Confederacy, which was then at war with the United States. It was there squarely held, because of the nonpayment of the specific periodical premiums, which nonpayment was sought to be excused because of the existence of the war between the Confederacy and the United States, that the company was nevertheless privileged to take advantage of such nonpayment as cause for forfeiture of the policy, and that the contract of insurance was annulled by reason of the existence of the war; upon the theory that it was against public policy that such an executory contract should continue to be performed after the commencement of the war; though it was held in substance that there could be recovery from the insurance company after the war, such portion of previously paid premiums as exceeded the premium value of the insurance risk resting upon the company up to the time the insurance contract became annulled by the existence of the war. In other words, the insurance contract was held to have been annulled by the commencement of the war and not merely suspended, because the time of payment of premiums thereon was of the essence of the contract, and in that respect it was also executory.

There is a sense in which time was of the essence of this contract, not in a narrow technical sense, it is true, but in the sense that it was to be performed within some time, manifestly within a reasonable time, not at some distant future time when conditions might be such as to render its forced performance inequitable. We are not concerned with the question of whether or not the forced performance of this contract would work to the detriment of the lumber company because of a

present increased value of lumber.   Nor would we be concerned with the question of whether or not the forced performance of this contract would work to the detriment of Heidner or Sohst because of a present decreased value of lumber, were this action a seeking of redress by the lumber company as against Heidner or Sohst.   The point is that the contract became impossible of performance for a period of time extending far beyond what was contemplated for its performance at the time of its making.   To say that the parties to this contract are still bound by its terms would be to make a new contract.   The fact that such new contract would be in the terms of the old one, would not change the fact that it still would be a new contract made by the court and not by the parties.

In the case of the *Textile Mfg. Co. v. Salomon Brothers*, decided in 1915 by the High Court of Bombay, India, reported in the Bombay Law Reporter, vol. 18, p. 105, February 29, 1916, there is a learned discussion of what was held to become a trading with the enemy contract, somewhat of the nature of that here involved, where the situation of the parties is opposite in order to these.   The contract there involved was between the manufacturing company, an English concern, and Saloman Brothers, a German concern, the latter agreeing to purchase and take a commodity from the former from time to time over a considerable period commencing before the beginning of the war between England and Germany and remaining largely executory thereafter.   In the action the manufacturing company sought to recover from Salomon Brothers damages for their failure to continue to take and pay for the commodity in question after the commencement of the war. It was held that the existence of the war not only annulled the contract so as to relieve the manufacturing

company from any obligation to furnish the commodity, but also relieved Salomon Brothers from any obligation to take and pay for the commodity, in so far as the contract remained executory in that respect after the commencement of the war. After reviewing a number of decisions touching the question of the annulling of such contracts by the commencement of war, Mr. Justice Macleod, speaking for the court, holding that the contract was annulled and not merely suspended, observed:

"These decisions follow a simple principle consonant with common sense and capable of universal application, thereby avoiding the many troublesome questions which must arise otherwise as to what should be done during the continuance of hostilities, and what should be the position of the parties when hostilities cease. There may be hardships in individual cases, but it is obvious that it is better to allow the parties if they so wish to renew their contracts at the end of the war, rather than bind them to continue business under the prior contracts when it is almost certain that the surrounding circumstances will be entirely altered."

In the text of 27 R. C. L. 927, the rule is stated as follows:

"Contracts which have been so far performed on the one side as to create an indebtedness on the other are not dissolved by war, but it is generally held that all pre-existing contracts of continuing performance are dissolved by intervening war, where their performance would be inconsistent with the duties which the parties owe to their respective countries, as in the case of contracts which would involve trading with the enemy or where the parties would be relieved from performance on principles common to cases of intervening impossibility."

See, also, Trotter's Law of Contracts During and After War, p. 61; the English case of *Zinc Corporation v. Hirsch* (1916), 1 K. B. 541, 1917C L. R. A. 650, and note in the latter cited volume at page 662; and the Australian case of *Moss v. Donohoe,* 7 B. R. Cases 889, and note at page 923. The general principles of the common law above noticed seem to us to clearly call for the holding that the contract here involved was wholly dissolved by the commencement of the war between the United States and Germany, and thereby rendered of no force as imposing any obligations upon either of the parties thereto. Of course, there remained the conceded obligation on the part of the lumber company, growing out of the advancement of a portion of the purchase price, to return the amount so advanced, which it has done, in legal effect.

On October 6, 1917, some six months following the entry of the United States into the war against Germany, there became effective the act of Congress known as the "Trading with the Enemy Act," 40 Stat. at Large 411. Section 3 of that act, in so far as we are concerned with its provisions, may be regarded merely as declaratory of the common law, though there is room for arguing that, under its terms, this contract should be held to have become unlawful in so far as it remained executory, even if it was a contract exclusively between Heidner and the lumber company. Section 8 of that act provides for the service of notice upon the Federal alien property custodian of the abrogation of such a contract entered into before the war.

Some contention seems to be made in behalf of Heidner that this latter section has not been properly complied with by the lumber company. We think, however, this is of no consequence in our present inquiry, because by the force of the common law this contract

became annulled by the coming into existence of a state of war between the United States and Germany, some six months before the passage of that act of Congress. It may have been the duty of the lumber company to have given notice to the alien property custodian, to the end that that officer might appropriate whatever funds or property had come into the possession of the lumber company in pursuance of the contract; but this, to our minds, is foreign to the question as to whether or not the contract was in law annulled by the coming into existence of the state of war between the United States and Germany some six months prior to the passage of that act. It does appear in this record that the lumber company did give to the alien property custodian notice of the making of this contract before the beginning of the war, of its executory character at that time, of what had been done by the parties thereunder, and of the lumber company's claim that it had been annulled by the entry of the United States into the war. We are not here, we think, called upon to inquire as to the sufficiency of that notice or its effect as between the alien property custodian representing the United States and the lumber company; that, as we view it, being foreign to the question of the annulling of the contract by the coming into existence of a state of war between the United States and Germany before the passage of that act.

In view of the tender made by the lumber company to Heidner of the whole amount of the portion of the purchase price of the lumber, which was paid by him to the lumber company; his refusal of that tender and the keeping of it good by the lumber company by the deposit of the amount thereof with the clerk of the superior court; and the annulling of the contract by the commencement of the war between the United

States and Germany; we conclude that Heidner has not shown any cause for recovery in any sum from the lumber company.

The judgment is affirmed.

MAIN, C. J., FULLERTON, and TOLMAN, JJ., concur.