## TAKAHASHI v. PEPPER TANK & CONTRACTING COMPANY ET AL.

(No. 2218; November 24, 1942; 131 Pac. (2d) 339)

334

336

338

For the plaintiff in error, there was a brief by *R. H. Nichols* and *S. J. Lewis* of Casper, and oral argument by *Mr. Lewis*.

For the defendants in error, there was a brief and an oral argument by *Carl L. Sackett* of Cheyenne.

BLUME, Justice.

This is an action, commenced April 15, 1941, for specific performance of a contract for the sale of personal property. A demurrer to the amended petition on the ground that the latter fails to state a cause of action was sustained, and plaintiff standing on his amended petition, judgment was entered against him, from which he has appealed to this court. A preliminary injunction issued herein was dissolved, and the action of the court in that connection, too, has been brought to this court. For convenience the parties will be referred to as seller and buyer, or, as in the court below, as plaintiff and defendant, and as though Joseph E. Pepper were the only defendant, since he appears to be in control of his co-defendant company, and transacted all of its business.

The contract in question, leaving out some minor provisions not material herein, is as follows:

"C. T. Takahashi & Company, Importers and Exporters, Seattle, U. S. A. November 7, 1940. Export Purchase for shipment to Japan. Seller: Joseph E. Pepper and/or Pepper Tank and Contracting Company of Denver, Colorado. Commodity: Eight (8) dismantled 80,000 barrel steel storage tanks, suitable for reassembling, complete with accessories including 100 foot outside swing and one valve leading to tank, except steel supports are not included. All of above to be in good condition. Specification: as provided in blue prints of American Bridge Company. Quantity: As above stated. Packing: Loose. Shipment per: By railroad cars from Casper, Wyoming, during November, December 1940, January 1941, at buyers call from Casper, Wyoming. Price $7450 per tank f.o.b. railroad cars, Casper, Wyoming. Payment: Sight draft against order bill of lading as previously. Inspection: Buyer's inspection governs. Weights: Railroad weight certifi-

cate. This contract shall be effective if ratified in writing by buyer on or before Dec. 10, 1940. Otherwise the same may be deemed cancelled. (Signed) Pepper Tank & Contracting Company, Joseph E. Pepper, President, Seller. (Signed) C. T. Takahashi & Company, Edward T. Osawa, Buyer." Then follows below: "This contract is contingent upon all governmental regulations prohibiting fulfillment hereof and other causes beyond our control."

The amended petition herein, filed June 7, 1941, states, in brief, as follows:

Plaintiff, C. T. Takahashi, is a citizen of the United States, residing at Seattle, Washington, and operating under the trade name of C. T. Takahashi & Company. Standard Oil Company announced to the trade that 14 of its 80,000 barrel tanks at Casper, Wyoming, were for sale. Plaintiff and defendant agreed, at the latter's solicitation, that the former should not bid thereon, but let the defendant bid, who would, thereupon, sell the material of these tanks to the plaintiff for an advanced price. That defendant, accordingly, purchased the tanks, and thereupon sold six of these tanks to the plaintiff under a contract not in controversy, and thereafter sold to plaintiff the remaining eight tanks, dismantled, under the contract dated November 7, 1940, hereinabove set out, the contract having been ratified by the plaintiff prior to December 10, 1940, the date specified for ratification in the contract. The parties entered into the performance thereof, and defendant delivered to plaintiff, according to the terms of the contract, five of the tanks, leaving only three, mutually mentioned as tanks 12, 13 and 14, for delivery. The call for these tanks was, by mutual agreement of the parties, postponed to April 10, 1941. On April 9, 1941, plaintiff asked for the delivery thereof, but, as shown by letter of April 10, 1941, defendant refused. Plaintiff is ready, able and willing to seasonably pay the defendant for these tanks in tender of a bill of lading

according to the terms of the contract. (Par. 7) : "That subsequent to the effective date of the contract aforesaid, in reliance thereon, and prior to defendant's said breach thereof, plaintiff entered into contractual commitments for his own disposition of said specific and ascertained material from said tanks 12, 13 and 14 following his receipt thereof, to other purchasers thereof and that if plaintiff is unable to comply with such commitments, he will be rendered liable to resulting claims by and multiplicity of suits with, said purchasers of said specific and ascertained material from him, the exact nature and extent of which claims and litigation cannot be presently pleaded, because unknown." Said tanks were of specifically fabricated and riveted material and of a pattern designed by American Bridge and Iron Works Company for the Standard Oil Company. The sale of the material thereof by plaintiff to other purchasers (as above mentioned) has been made so that the dismantled material of these tanks could be restored and reconstructed substantially according to the original plans and specifications of the Standard Oil Company. Plaintiff is unable to now secure substitute material of like kind and quality, for the reason that such has not been readily obtainable upon the market since execution of said sales contract between the parties hereto, and has not been obtainable upon the market since April 10, 1941. Defendant has threatened to dispose of these tanks to other parties, is rapidly shipping it out of Wyoming, and unless enjoined, a decree of specific performance will be of no avail and plaintiff will incur irreparable damage, and he cannot be adequately compensated in damages "in that the nature and extent of plaintiff's resultant damages, incident to fluctuating steel markets, rapidly changing economic, legislative, administrative and political conditions, also multiplicity of suits, consequent upon any failure by plaintiff to comply

with his commitments aforesaid, of said material, cannot be ascertained," and, in that, as plaintiff is reliably informed, defendant is unable to respond in damages, and plaintiff is, accordingly, without plain, adequate and speedy remedy at law. Plaintiff accordingly prays for a decree of specific performance of the contract and for an injunction.

The plaintiff did not call for the property in controversy here during November or December, 1940, or January, 1941, and so, apparently, defendant sent a telegram to plaintiff about February 19, 1941, asking about it. On that date plaintiff wired to the defendant to "defer loading tank number 12 until United States Export License received. Application filed last week. Osawa now in Washington awaiting action this application." On February 20, 1941, plaintiff, by W. S. Shenker, wrote to the defendant "I am in Seattle visiting our home office and note your latest wire to us relative to tank No. 12 and balance of tanks on hand. You undoubtedly are aware of the fact that the embargo was ordered effective midnight last Friday on steel tanks. This necessitated a new license covering the balance of our purchases. In anticipation of this difficulty, we filed our license even before the embargo went into effect, and Mr. Osawa is now in the East awaiting action on our application. As soon as final word is received on the subject, which we trust will be very shortly, we will give you full shipping instructions, and trust that same will be very satisfactory to you." On March 1st, 1941, the defendant wrote to plaintiff, referring to the length of time it might take to obtain a license, and asking plaintiff if a Mr. Keyes could not inspect the tanks, and plaintiff could not then accept them, so as to close the transaction. On March 13, 1941, plaintiff wrote the defendant that he was still awaiting action on his application for license, and would, immediately upon receiving it, contact the de-

fendant. On March 29, 1941, the defendant wrote the plaintiff, and after referring to the undue delay of ordering shipment, and the expense involved to the defendant on account thereof, stated: "Your Mr. Shenker called my wife by telephone on March 27th stating that you would like to have two more weeks time in which to take the delivery of the last three tanks. I appreciate our amicable relations in this matter, and do not wish to do anything which would prevent our future mutual business, and we will therefore extend the time for a period of two weeks from March 27, 1941, as requested, and at this time advise that unless we receive shipping instructions by April 10, 1941, we shall consider the contract terminated." On April 9, 1941, plaintiff, by Wm. Shenker, sent defendant a telegram from Washington, D. C., reading: "Here fighting for license, please extend final action April 16. Wire confirmation." On the same day, the defendant received the following letter: "By your registered letter of the 29th ult. the period for your receipt of our shipping instructions re tanks 12, 13 and 14 Standard Oil Company (Ind.), location Casper, was extended to April 10, 1941. You are hereby instructed to ship the material to us, at warehouse lease trackage facilities of Natrona Transfer, Storage & Fuel Co., C. B. & Q. R. R., Casper, Wyoming. Takahashi & Company by (signed) J. Strangeways." On April 10, 1941, defendant wrote to Mr. Strangeways at the Gladstone Hotel, at Casper, Wyoming, that the directions for shipment were not in accordance with the contract for the following reasons: "1. The authority of J. Strangeways to represent Takahashi & Company is not shown. 2. The contract expressly provides that this is an export purchase for shipment to Japan. Your directions are not in compliance with this provision of the agreement. 3. No sight draft has been tendered in payment of these tanks. It is our further understanding that under the

regulations of the United States, now in effect, no licenses are being issued to permit shipment of iron and steel to Japan. Therefore we must adhere to our original cancellation notice as extended and regret our inability to reply with your request, reserving to the seller all other defenses, conditions and remedies contained in said agreements of November 7, 1940." The letters of March 29, April 9 and April 10 were made part of the amended petition as exhibits thereto.

The case is before us, as already stated, upon the ruling of the court on the demurrer to the amended petition, and on the question of dissolution of the temporary injunction herein. It is admitted, however, that it is unnecessary to consider the latter, if the amended petition is found insufficient for a decree of specific performance. We have found it so, and hence need not discuss the subject of injunction. Counsel for plaintiff strenuously insist that we must not consider, as they believe the trial court did, any matters extraneous to the amended petition. Counsel contend for the ordinary rule, which seems to have but few exceptions, and which, curiously enough, they themselves did not completely observe. We have followed the ordinary rule. When we speak of extraneous matters, we must, of course, be sure that they are in fact extraneous, and not matters which for want of necessary allegations or otherwise may be presumed or inferred. Reasonable or necessary inferences or presumptions may be drawn from facts which appear on the face of the pleading or are omitted therefrom, and that rule may work for or against the pleader. 49 C. J. 423, 436. Lackawana Coal and Iron Company v. Long, 231 Mo. 605, 133 S. W. 35. We have in our discussion herein incidentally referred to one or two extraneous matters, not because necessary to our conclusion herein, but merely for the purpose of elucidation.

■ The controversy herein has given rise to quite a

few questions. It is contended by defendant that the contract is invalid because it lacks mutuality, in that it does not contain an explicit promise to buy. Neither does it contain an explicit promise to sell. That has not been mentioned by counsel, nor have they deemed it necessary or wise to discuss as to what bearing the conduct of the parties has had in that connection. It is also contended by counsel for the defendant that the extension of the contract from January to April lacks consideration and hence is not binding. Perhaps the nature of the contract and extension has a bearing on that point and counsel have not deemed it necessary or wise to discuss that. If it is in the nature of an option, then though an extension, according to Ide v. Leiser, 10 Mont. 5, 24 Pac. 695, 24 A. S. R. 17, cited in defendant's brief, ordinarily requires consideration, yet, according to the same case, when an offer of an option to purchase is made and is extended, if the option is exercised during the time of the extension, a binding contract ensues, though the extension was without consideration. Nor has the question been sufficiently argued whether or not the option was exercised according to the terms of the offer, though it is incidentally stated by counsel for defendant that the call of April 9, 1941, was a "trick-call." If the contract became reciprocally binding by acceptance on or before December 10, 1940, then the question arises whether the so-called extension is in the nature of a waiver of time of performance; whether such waiver requires consideration, as to which the authorities are not clear (see 12 Am. Jur. 994; 67 C. J. 296, 297) ; whether the time and effort spent by plaintiff in an endeavor to get licenses to export to Japan had the effect of making the waiver binding. These, and perhaps other questions which are kindred and pertinent, have not been investigated and elucidated by counsel, so that we have deemed it best to leave them unanswered.

350

■ Specific performance for delivery of personal property is the exception, not the rule. Pomeroy, Specific Performance (3rd ed.) Sec. 11; 58 C. J. 1033. Many cases have been cited by counsel for plaintiff in which specific performance of a contract for the delivery of chattels has been enforced, but the facts in these cases bear no resemblance to the facts in the case at bar and shed no or little light thereon. The grounds for an action for specific performance are that the damages are (1) inadequate, and (2) impracticable. Pomeroy, supra, Sec. 8. Chattels may have a peculiar or special value to the person entitled thereto; there may, for instance, be only what is called pretium affectionis, such as an heirloom, in which case the damages could not be measured in money. Nevertheless, there must be some damage or detriment, though not necessarily in money. A man is entitled to the benefit of his bargain. If a seller refuses to deliver the property sold to the buyer, the latter may sue for damages. If there is no damage, he cannot recover. If he is damaged, he must allege it. 55 C. J. 1126-1127. Inadequacy of damages or difficulty in ascertaining them implies some damage. And it would seem, accordingly, that unless a petition for specific performance discloses that the petitioner has been or might be damaged; that his bargain has been or might be of benefit to him, or that the property has some peculiar or special value to him, no cause of action has been stated. We must, accordingly, examine the allegations of the amended petition herein.

It is alleged in paragraph 7 thereof that after the contract became effective, plaintiff resold the property herein involved to other parties, and that if plaintiff is unable to comply with such commitments, he will be liable to resulting claims by and multiplicity of suits with such other parties. It is not alleged to whom the property was resold. It is stated in 22 C. J. 103, 105,

that "it will be presumed * * * that a business transaction was conducted in the regular and usual manner." In 31 C. J. S. 788 we find this statement:

"Unless a contrary showing is made, the presumption is that the ordinary course of business or conduct was followed in a particular case. It is a well established rule of evidence that events or facts which usually happen or coexist in the ordinary course of business and other human affairs are presumed to have happened or coexisted in any particular case, unless the contrary appears from the evidence. In the absence of a contrary showing, it is presumed that the ordinary course of business or conduct was followed in a particular case."

The contract in this case, which is made a part of the petition, shows that plaintiff's business is that of an exporter and importer, and that the property was bought for "export purchase for shipment to Japan." In the ordinary course of his business, plaintiff, when he would buy property to be exported by him to Japan, would, of course, sell it to parties in that country. Hence, under the rule of law above stated, and the facts appearing on the face of the petition, and nothing to the contrary appearing, the reasonable and apparently the only reasonable, inference, or presumption, which arises is that the resale of the property mentioned in the petition was made to purchasers in Japan. The facts in this case furnish a good test, or illustration, of the reasonableness of the rule of law above mentioned. On April 9, 1941, the very day when shipment to the warehouse in Casper was directed to be made, and which was but a few days before this action was commenced, the plaintiff, according to a telegram of that date, was still trying to get a license to export property to Japan, and wanted the contract extended to April 16. These facts render it substantially certain that plaintiff sold the property to purchasers in Japan. Now, aside from the prohibition of export hereafter to

be discussed, war exists between the United States and Japan at this time. While that was not true when the judgment was rendered in the trial court, and while ordinarily only the record before us is considered, the court will at times—for instance when a case is moot—consider and apply facts occurring subsequent to the rendition of the judgment below. It is clear that public policy requires us to take judicial notice of the existence of war, and it would, of course, be useless to send the case back, merely so that the trial court could consider that fact. Metropolitan Water Board v. Dick Kerr & Co., 2 K. B. (1917) 1, 31. By reason of war the resale contract with purchasers in Japan was dissolved, since the property in controversy is important war material, and would, if sent to Japan, give aid and comfort to the enemy. Note 137 A. L. R. 1210-1211; 67 C. J. 353; 6 R. C. L. 714; note L. R. A. 1916, 71; Webber, Effect on War on Contracts, p. 68; Second Russian Ins. Co. v. Miller, 297 Fed. 404, aff'd. 268 U. S. 552, 69 L. Ed. 1088, 45 Sup. Ct. 593; Heidner v. Lumber Co., 124 Wash. 652, 215 Pac. 1 and authorities cited; Section 3 and 16, Trading with Enemy Act, 50 U. S. C. A. p. 198, 289. It is clear, accordingly, that plaintiff could not be damaged by reason of the resale of property in Japan, unexecuted as it is, and cannot furnish any basis herein for specific performance. Plaintiff in paragraph 9 also alleged that he would sustain irreparable damage due to rapidly changing economic and other conditions and due to multiplicity of suits already mentioned. In view of the fact that plaintiff had in paragraph 7 shown the source and the reason for his damage, and no other seems to be indicated, no particular strength seems to be added to the petition for specific performance by reason of this allegation. Plaintiff further alleged that material of like kind as that purchased, by reason of a special pattern and design thereof, cannot be obtained in the market.

It is stated in 58 C. J. 1039 that "a contract for the sale and delivery of articles *indispensable in specie* to the party seeking relief, unobtainable elsewhere, except at considerable expense, trouble or loss which cannot be estimated in advance will be specifically enforced." To the same effect is Pomeroy, supra, Sec. 15; Bowman v. Adams, 45 Idaho 217, 261 Pac. 679. We find no allegation in the amended petition that the property here involved is necessary, let alone indispensable, to plaintiff, except to meet the resale contract with purchasers in Japan. That resale contract, as we have seen, has become dissolved, and the property is not, accordingly, necessary to plaintiff to meet it. The rule last mentioned does not, accordingly, apply. The amended petition contains no allegation that the material bought is of greater value than the contract price—not yet paid—or that it could have been, or could be, sold to parties in this country for more than the contract price; there is no allegation that it is of any peculiar or special value aside from such resale to plaintiff or to any other party with whom he has or may have contractual relations. The sum and substance of plaintiff's amended petition seems to be that he has resold the property to parties in Japan; that he wants it and it is necessary to him for that purpose; that it cannot be obtained on the market; that hence he cannot deliver it to the purchasers from him, and so will, on that account, be subjected to a multiplicity of suits and sustain irreparable damages. Plaintiff could not obtain a decree of specific performance for these reasons, and none other appears or at least does not clearly appear.

██ We might rest our decision herein on the point just discussed. But other points have been argued by counsel, some or all of which are important, and are thought to be controlling herein, so that we have not deemed it best to ignore them, particularly since our

view of the point already discussed differs considerably from that which was presented to us by counsel. The defendant contends that, in view of the fact that the property in question was sold and bought for the purpose of being exported to Japan, the contract was dissolved upon the issuance of the presidential proclamations hereafter mentioned. We shall later on in this opinion discuss the contractual provisions relating thereto, but shall at the outset consider the legal effect herein of the presidential proclamations. In the latter case we deal with implied instead of express conditions. See Note, 137 A. L. R. 1239, 1240.

Pursuant to an act of Congress entitled "An Act to expedite the strengthening of the national defense," approved July 2, 1940, the president of the United States issued the following proclamation of December 10, 1940: "Now therefore, I, Franklin D. Roosevelt, president of the United States of America, acting under and by virtue of the authority vested in me by law, do hereby proclaim, that, upon the recommendation of the administrator of Export Control I have determined that it is necessary in the interest of national defense that on and after December 30, 1940, the following described articles and materials shall not be exported from the United States, except when authorized in each case by a license as provided for in proclamation No. 2413 of July 2, 1940, entitled 'Administration of section 6 of the act entitled "An act to expedite the strengthening of national defense" approved July 2, 1940: Iron and Steel." United States Statutes at Large, Vol. 54, part 2, page 2768. This proclamation was followed by two similar proclamations dated February 4, 1941, effective February 10, 1941, including therein, among other material, various steel products, and structures. Federal Register, Vol. 6, pp. 781-784. It is generally held that where a statute requires a license to engage in any trade or business, a contract

with reference to such business, without a license, is illegal and unenforceable. 13 C. J. 423; 37 C. J. 259; 17 C. J. S. 559; Zimmerman v. Brown, 30 Idaho 640, 166 Pac. 924; Harriman v. Strahan, 47 Wyo. 208, 33 P. (2d) 1067. A proclamation of the President, in pursuance of an Act of Congress, should have the same effect. In 55 C. J. 199, it is said that "the rule that an agreement the object of which is illegal, is invalid and will not be enforced applies to contracts of sale. Such a contract may be illegal because of its immoral purpose, or because it violates some positive law, or is contrary to public policy." Williston on Contracts, Rev. Ed., Sec. 1759, states that "where a contract was originally legal, but because of a change in the purpose of the parties, or a change in the law, performance of the acts contracted for on one side or the other has become illegal, any subsequent performance of such acts is against public policy, and the party who has undertaken to perform them is excused from so doing." To the same effect are Industrial Dev. Co. v. Goldschmidt, 56 Cal. App. 507, 206 Pac. 134; Bunch v. Short, 78 Va. 764, 90 S. E. 810; Advertiser Co. v. State, 193 Ala. 418, 69 So. 501; 12 Am. Jur. 954, 955; Note 10 Ann. Cas. 1024.

While, accordingly, the purpose of the contract here involved and the performance thereof according to that purpose became illegal when the presidential proclamations were issued, and, perhaps, logically, immediately terminated the contract (12 Am. Jur. 955), the courts generally have drawn a distinction between a law which renders the performance of a contract unlawful altogether, and one which suspends the performance without condemning the subject of the contract, and the rule, it is said, is especially applicable to cases arising under the embargo laws. 12 Am. Jur. 956; note 10 Ann. Cas. 1025. Lord Dundin stated in Metropolitan Water Board v. Dick, Kerr & Co., App. Cas. (1918)

119, 128: "But to make what I call a clean case of illegality, the illegality must be permanent." And the rule appears to be that whether or not an embargo, or suspension of trade, dissolves a contract or merely suspends it, depends on the circumstances, so that, if a party repudiates a contract, involving such embargo or suspension of trade, without waiting a reasonable time, he takes the risk that it may in fact be but temporary. Some of the cases contain expressions stating outright that such embargo or suspension merely suspends the performance. See 67 C. J. 343; Baylies v. Fettyplace, 7 Mass. 325; American Lumber Mfg. Co. v. Atlantic Mill & Lumber Co., 290 Fed. (C. C. A.) 632 (involving an embargo of shipment from one part of this country to another). In an annotation to L. R. A. N. S. 1916 F. 73, it is said more cautiously that "in other cases embargoes temporarily preventing performance of a contract have been held to suspend rather than to terminate the contract." See also Williston, supra, Section 1957. In Webber, supra, p. 428, the author states that "where by reason of an act of the Executive Government, such as the imposition of an embargo or the prohibition of export, a temporary suspension occurs which does not prevent the agreement from being carried out within a reasonable time, the contract is not dissolved." The author quotes from a statement of the so-called Buckmaster Committee (1918), which is to this effect: "If the obligations undertaken become illegal either by reason of the other party to the contract becoming an enemy or by reason of a duly constituted authority lawfully prohibiting its performance, the contract is dissolved, unless the illegality is of so temporary a character that the time for performance of the obligations may not have elapsed before the illegality ceases." The English cases treat the subject of illegality, arising from the act of the Government, in connection with the doctrine of frus-

tration of enterprise, making the latter doctrine the real basis for the decision, but holding that "it is much easier to imply a term that the contract shall cease to be binding if its performance becomes illegal." Metropolitan Water Board v. Dick, Kerr & Co., 2 K. B. (1917) 1, 24, aff'd. in App. Cas. (1918) 119. The doctrine of frustration, it is said, has been developed mainly since 1916. Tatem v. Gamboa, 1 K. B. (1939) 132, 136. In Andrew Miller & Co. v. Taylor & Co., 1 K. B. (1916) 402, one of the leading cases on the subject before us, it appears that the Government prohibited the export of confectionery. Four days thereafter, the defendant repudiated the contract. The prohibition to export was annulled within 10 days after the proclamation. It was held that the defendant should have waited a reasonable time before repudiating the contract. Swinfen Eady, L. J., after stating the rule that if the performance of a contract has been rendered unlawful by the Government, the contract is dissolved, stated (p. 410-411): "But in the application of this rule care must be taken to consider whether an event which has happened has really rendered the performance of the contract impossible or merely operated to suspend or delay its execution. * * * In the present case if the interruption were such that the contract could not be carried out in a reasonable time, then it would invalidate the contract. If on the other hand the interruption is such that it does not prevent the agreement being carried out within a reasonable time, having regard to the terms of the contract itself, then a mere temporary interruption does not annul the contract." In that case the circumstances indicated that the suspension might be but temporary, the same judge stating (p. 409): "But in my opinion having regard to the circumstances under which those proclamations were made, it was impossible just at that time or about the dates of the proclamations, to know whether the

prohibition enforced by the proclamations would last for any considerable time, and it was probable that in the course of a few days the position would become clearer as the situation developed. By the 20th, it had become much clearer, and the export of confectionery and other things previously prohibited, was then allowed." In Metropolitan Water Board v. Dick, Kerr & Co., 2 K. B. (1917) 1, 24, in which an order of the government was held to dissolve the contract, it was said among other things: "The trial judge or the court of appeal is entitled to take into account the real duration of the interruption as proved by the facts that have happened since the writ. 'The court of appeal was entitled to make such order as the judge could have made if the case had been heard by him at the date on which the appeal was heard' per Lord Gorrell in Attorney General v. Birmingham, Tame and Rea Drainage Board (1912) A. C. 802." In Geipel v. Smith (1872) L. R. 7 Q. B. 404, 414, it was said "But then, it is said, it is possible the blockade might be raised within a reasonable time. No doubt it was possible. But it must be taken on this record that it was not raised within a reasonable time; so if the defendants chose to run the risk, and in the event turn out right, they are in the same position as if they had waited the reasonable time and had then sailed away." That means, as applied in this case, that the defendant in the case at bar is in the same position by reason of subsequent events as though he had refused to deliver the property at the present time, instead of on April 10, 1941. In Pollock on Contracts (10th ed.) 356, the author states that "on principles of the English law it is not competent to any domiciled British subject to enter into a contract to do anything which may be detrimental to the interests of his own country. An agreement may be void for reasons of this kind either when it is for the benefit of the enemy or when the enforcement of it would be an

affront to a friendly state." And the same author, on page 304, takes the view that in recent years, domestic acts of executive authority conferred for war purposes have had like effect as the operations of war. Williston, supra, section 1978, states that the American decisions hold that an indefinite embargo discharges both parties. And an author in 56 L. Q. R. 128 states that "permanent," "in the mouths of lawyers and laymen does not mean eternal. It means rather that at present the end of the duration cannot be foreseen." The case of Allanwilde Transp. Co. v. Vacuum Oil Co., 249 U. S. 377, 69 L. Ed. 312, 39 Sup. Ct. 147, 3 A. L. R. 15, was a case brought against a ship company. It appears that on September 28, 1917, the Government decided to refuse clearance to any sailing vessel bound for the war zone. The shipowner then had the cargo of the plaintiff on board, but unloaded it at the end of the month of October. It was contended that this was too early, and the question whether the embargo was temporary or otherwise was discussed. The court said: "And it is further urged that such embargo was at most but a temporary impediment, and the cargo should have been retained until the impediment was removed or transported in a vessel not subject to it. We cannot concur in either contention. Necessarily the embargo would be continued as long as the cause of its imposition—that is, the submarine menace—and that, as far as then could be inferred, would be the duration of the war, of which there could be no estimate or reliable speculation. The condition was, therefore, so far permanent as naturally and justifiably to determine business and action depending upon it." In Varagnolo v. Partolo Mfg. Co., 209 App. Div. 347, 204 N. Y. S. 577 (affirmed without opinion in 239 N. Y. 621, 147 N. E. 221), it was said that "there seems no legal doubt that a governmental prohibition of the export of goods is an excuse for non-performance of a contract, upon the doctrine that

performance would thereby be rendered illegal, and would subject a contracting party to prosecution, with attendant fine or imprisonment." See also note 137 A. L. R. 1214-1215. In United States Trading Corp. v. Grain Co., 56 Cal. App. 176, 205 Pac. 29, which reviews a number of cases, it was held that a domestic embargo is presumably temporary only and merely suspends delivery, but the court clearly indicates that the surrounding circumstances may show that an embargo entirely frustrates a contract and that a domestic embargo may be different from one relating to shipment abroad.

If we apply the rule of the foregoing cases, we cannot hold that the embargo or suspension of trade with Japan could reasonably have been expected to be temporary only. A war was then raging; the Lend-Lease Bill had been passed; we were helping Great Britain in her struggle with Germany; Japan was in alliance with the latter; we were strenuously preparing for national defense; the embargo or suspension of trade in steel—war material as steel is—would naturally last until the removal of the cause or causes, and the end of these could not possibly be foreseen. Whether or not the defendant waited a sufficient length of time—namely, from about the middle of February to April 10—before repudiating the contract and treating it as dissolved, is not, according to the foregoing case, material, for the subsequent events proved him to be right. Nineteen months have now intervened and the suspension of exports is still in effect, and meanwhile war between the United States and Japan has supervened. We think that the contract was not merely suspended, but was dissolved, unless, perchance, it can be held that it is still in force by reason of the fact that the purpose of the contract to export to Japan, which became illegal, was entirely taken out of the case.

We should in this connection mention the case of

H. O. Brandt & Co. v. H. N. Morris & Co. (1917), L. T. N. S. 1916, heard on appeal from the King's Bench Division. It appears—so far as relevant here—that a contract had been entered into for the sale of aniline oil, destined for export to the United States. The goods were sold f. o. b. Manchester, the residence of the seller, f. o. b. meaning on board a vessel. The government prohibited the export of aniline oil. It was held that it was the duty of the buyer to procure a license and a ship for export. That appears to be the general rule at least where shipment is to be made by vessel, although courts are divided as to the rule applicable in cases of domestic shipment by railroad. 55 C. J. 374, 375; notes 6 L. R. A. N. S .928; L. R. A. 1917 A 1163. And the court in the foregoing case held, accordingly, that since the purchaser in that case failed to procure the license and a ship, the seller was not liable in damages for not delivering the property as he had agreed. An action for specific performance is the alternative for an action in damages (in the proper instance), and we can think of no reason why the court would have held different if such a case had been before it. The case, therefore, seems to be closely analogous to the case at bar, except that the court did not discuss or refer to any contention that the purpose of export was not in, or was eliminated from, the case, since no such contention was before it.

Counsel for plaintiff seem to contend that the presidential proclamations, of which we take judicial notice (31 C. J. S. 604), have nothing to do with this case. They state in their brief that "there is nothing in the record indicating that any government regulation was ever so exercised as to prohibit fulfillment of the contract." They mean apparently, that the record fails to show that a license was not or could not have been procured; that the burden to show that was on the defendant, and that in the absence of such showing by

the defendant, the prohibition to export was not in the case. We think that counsel are mistaken. There is little direct authority on the point, but the English case last above cited seems to be closely in point. If the burden in connection with the license was on the purchaser under the facts in that case, little reason seems to exist why the plaintiff should not in this case have alleged that he procured or was able to procure a license, if he wanted to escape the conclusion above mentioned in connection with the termination of his contract by reason of the prohibition of export. Long ago, Greenleaf on Evidence, Sections 78 and 79, laid down the rule that if a party relies upon a negative or an exception, such as a license, the burden is on him in connection therewith. Numerous cases have dealt with the subject of presumptions and burden of proof in connection with licenses. Jones on Evidence, section 497; 37 C. J. 561, 569. In criminal prosecutions for doing an act without a license, the greater number of cases hold that the burden to prove the possession of a license is on the party who asserts that he has one. The courts are divided on the question as to what the rule should be in cases where a man sues to recover money, which he would not be entitled to recover unless he has a license. Wigmore, Ev. (3rd ed.), Section 2486, is probably right when he states that it is a question of policy and fairness based on experience in the different situations. In the case at bar, the prohibition to export is undoubtedly the rule; the right to export by reason of a license, the exception. It was made a criminal offense to export without such license. The proclamations above mentioned were issued pursuant to a broad, general policy for the purpose of national defense. To accomplish that policy, licenses to export would naturally be rare, except, perhaps, to export goods to a friendly nation. The repeated issuance of proclamations against export under the national defense act

indicates a more and more settled policy as time progressed. The policy seems to have become reasonably well settled as to export of steel in February, 1941. The issuance of licenses to export steel after that time to an unfriendly power would, in the nature of things, be rather unusual, and Japan was not any too friendly. We should not be asked to assume the unusual, and so we cannot assume that licenses were being issued for export of steel to that country. If plaintiff procured one, or was able to procure one, he should have shown that affirmatively. In other words, we must assume, the contrary not appearing, that no license to export the goods in question was ever issued, or would be issued, leaving the question of termination of the contract above discussed of importance herein, unless, perchance, as already indicated, the purpose to export is not, for one reason or another, in the case, or has been eliminated therefrom. Moreover, if the contract remained alive, as plaintiff contends, for specific performance, and the purpose to export to Japan remained an integral part of the contract, then, since war has now supervened, and to carry out the purpose mentioned would involve trading of war material for the benefit of the enemy, we should have to declare the contract dissolved for that reason. Webber, supra, 79; note 137 A. L. R. 1210, 1211. Restatement of Law of Contracts, Sec. 594; Williston, supra, Sec. 1748; Pollock, supra, 356, 357.

■■■ It is argued by plaintiff that the provision as to the purpose of exporting the property was inserted solely for the benefit of the plaintiff. We are cited to Fred W. Mears Heel Company v. Walley, 71 Fed. (2d) 876. That involved a contract for the importation of lumber from Canada, with the provision that if a tariff should be imposed the contract should be void. A tariff was thereafter imposed, and it was held that the purchaser had the option to take the lumber, if he chose,

notwithstanding such tariff; that the clause as to the tariff was, as had been found by the trial court, inserted for his benefit alone. In other words, he had the option to insist upon the clause or waive it. A holding to that effect is doubtless just in some cases. See also Kubillus v. Ewart, 40 Wash. 38, 82 Pac. 147 and authorities cited. It is not clear that it would be so in the case at bar. The seller in this case was required to dismantle the tanks at great expense. It does not appear whether or not he would have been compelled in any and all events to have done so in order to subserve his own needs. If not, it does not seem altogether fair to him that, after incurring such expense, the buyer could repudiate the contract at his pleasure, because of the clause relating to its purpose, while at the same time leaving the seller under the necessity to perform at all events. Furthermore these cases, just cited, are unlike the case at bar. They do not involve any purpose, at least no purpose which might become illegal.

To determine the importance which the purpose of export involved in this case was intended to play, we must examine the contract a little further. It, the contract, is exceedingly fragmentary. There is no specific agreement to sell; no specific agreement to ship; no specific agreement to pay; no specific agreement to buy. If the terms "seller," "shipment," "buyer," and "payment" are to be construed as containing specific agreements, what are we to say as to the clause "export purchase for export to Japan?" The contract—if it can be called such—contains the further clause: "The contract is contingent upon all governmental regulations prohibiting fulfillment hereof and other causes beyond our control." The clause does not provide that the "purchase" is thus contingent, but that the "contract" is. The only conceivable, or at least the probable, reason why it was inserted is because the contract provided for "export purchase for export to Japan." That

not only shows that the latter clause was an essential and not immaterial part of the contract, but further that the two clauses cannot be treated separately, and must be read together. "Contingent," it is said, means "dependent for effect on something that may or may not occur." Webster's New International Dictionary; 13 C. J. 114; Verdier v. Roach, 96 Cal. 474, 31 Pac. 554. In other words, giving the clauses their ordinary meaning, they seem to state that whether or not the contract should be enforceable should be dependent on whether or not the Government would prohibit the export of the property, etc. The contingency seems either to terminate the contract or suspend the performance thereof. The result would be the same in this case. The contingency clause seems to be in the nature of a condition subsequent, which has been defined as referring to a future event upon the happening of which an obligation becomes no longer binding on a party in whose favor the condition was created, if he chooses to enforce it. Lowe v. Copeland, 125 Cal. App. 315, 13 P. (2d) 522. In W. N. Clark Co. v. Packing Company, 12 Ohio App. 87, the court stated that a contingency stipulated in a contract, on the happening of which the contract already in effect may be defeated, constitutes a condition subsequent. We have no doubt that if plaintiff had not for some reason chosen to demand the property, and had instead been sued for the price, he would have claimed, and we think rightly so, that the occurrence of the contingency released him from the contract. See M. A. Quina Export Co. v. Seebold, 287 Fed. 626; Lawrenceburg Rolling Mills v. Jones & Co., 204 Ala. 59, 85 So. 719; Haber v. Jacobson & Co., 185 App. Div. 650, 173 N. Y. S. 524; Clark v. Cox, McEuen & Co., 1 K. B. (1921) 139.

Were the clauses inserted for the benefit of the plaintiff alone, so that the contract was terminated only at his option? It is held in Cantiere Navale Triestina v.

Handelsvertretung etc., 94 Law Journal (1925) 579, that no general rule can be laid down, as to whether an exception clause operates in favor of only one or both parties to a contract, and that each case must be determined by the circumstances. In the case at bar, the contract on its face released both parties from further performance when the contingency contemplated came into existence. And there can be no doubt, of course, that provisions may be made in a contract which contemplates an ipso facto cancellation upon the happening or occurrence of a stipulated event or condition. 55 C. J. 254; Williston, supra, Sec. 1968. To construe the provisions as being one-sided, giving the benefit or protection thereof only to the purchaser, leaves, in a case such as before us, at least a doubt as to the justice of the interpretation. We have already mentioned a situation in which such interpretation might not be just. If it had been the intention to protect the purchaser only, that could easily have been done by providing that the "purchase" should be contingent, etc., instead of providing that the "contract" should be thus contingent. Clark v. Cox, McEuen & Co., supra.

We have some cases in which the courts have considered clauses by which the contract was made contingent upon certain events. General Commercial Co. v. Butterworth-Johnson Co., 198 App. Div. 799, 191 N. Y. S. 64; New England Concrete Const. Co. v. Lumber Co., 220 Mass. 207, 107 N. E. 917; Metropolitan Coal Co. v. Billings, 202 Mass. 457, 89 N. E. 115; Haskins Trading Co. v. Pfeiffer & Co., 14 La. App. 568. In these cases the main point considered was whether the contract was ended or merely suspended upon the happening of the contingency, and it was held, under the circumstances of these cases, that delivery was too late and could not be enforced by the seller. That specific point is, as already stated, not important herein. Nevertheless what is said in some of these cases sheds light

on the situation before us. In the New York case the court called attention to the fact that the "provision in the contract is that the 'contract' and not the 'delivery' was contingent upon strikes," and the court also stated that "the clause unquestionably was inserted for the benefit and protection of the seller and intended to relieve him from performance of the contract in the event of the happening of any of the events described." In the case at bar, the export to Japan was only to begin at Casper through the acts of the defendant by placing the property on board railroad cars, and the further shipment to Japan was, we infer, to be continued by the plaintiff. We could, accordingly, hardly say that the contingent clause in this case was for the exclusive benefit of the defendant, the seller, but there seems hardly any reason for holding that it was not partly for his benefit. In the Louisiana case above cited, which involved a shipment of goods from Mexico, and an embargo placed thereon by the Government of that country, the court significantly stated:

"It is argued here by defendants that as soon as the embargo was learned of they were within their rights in assuming that the contract was at an end; in other words that the entire agreement was to be performed only if certain named contingencies did not take place prior to performance, and that as soon as one of these contingencies did take place, the contract was immediately and automatically terminated without liability in either party. Such an interpretation can be placed upon the stipulation, since it will be noted that the entire agreement is made contingent upon such an event as happened."

It is doubtless true that a seller is not ordinarily interested in what a purchaser wants to do with the property which he buys. But this is not the ordinary case involving a clause which relieves the parties from liability in the event of certain contingencies. The contract on its face contains a purpose which became ille-

gal when the presidential proclamations were issued, and public policy must be taken into consideration in this case, even if it should not be deemed conclusive, in interpreting the clauses before us. Public policy would seem to require an interpretation which would make that policy effective and not hinder it. To release both parties from the contract when export to Japan was forbidden would be more effective than to release only one of them, at his option, unless, perchance, the contract was entirely purged of its illegal purpose, which, as hereafter mentioned, is not clear. And the relation of the defendant to that public policy should be given due weight, and assumes a greater prominence in view of the conditions and alliances in the world already mentioned. In this case the seller did not merely have knowledge of the purpose stated on the face of the contract. It was he who made the offer on November 7, 1940, to sell to the purchaser the property for export to Japan. The purchaser thereafter accepted the offer, presumably with all the terms thereof. The seller, accordingly, was involved in the purpose for which the sale and purchase was made, as much so as the purchaser, if not more so. And when the contingency mentioned in the contract arose, he had at least this much interest, that he was entitled to protect himself against involvement in any claim of desire, collusion or conspiracy of wanting to ship the goods to Japan in violation of the presidential proclamations. And we are not persuaded that such interest was so trifling as to be unworthy of consideration.

Counsel for plaintiff further argue that if the clauses above mentioned were for the benefit of the plaintiff, he waived them. They have failed to distinguish between the facts in this case and the facts of the cases upon which they rely. Plaintiff waived the cancellation of the contract. But the waiver did not go far enough. We fail to find that he waived or renounced the purpose

which had become illegal, as will be more fully shown presently. It can hardly be successfully maintained that he was entitled to the performance of the contract according to its letter. Counsel further argue that if the foregoing clauses were inserted for the benefit of the defendant, he, too, waived them, mainly by extending the contract. But we cannot construe that extension as an unconditional waiver. We cannot assume that defendant failed to consider the law and the presidential proclamations when he made the extension, and we may well assume that it was made with them in mind. In other words, it was conditional. It was the duty of the plaintiff, as already shown, to obtain a license to export the property to Japan, if he wanted to export it. And when on April 9, 1941, the demand for delivery of the property was unaccompanied by a showing that he had obtained a license, or, at least, was unaccompanied with a renunciation of the purpose which had become illegal, the defendant was, we think, justified in hesitating to comply with the demand. Williston, supra, Sec. 1757; H. D. Brandt & Co. v. H. N. Morris & Co., supra. It may be, as counsel for plaintiff contend, that he did not act from the purest motives, but that could not deprive him of his legal rights.

It is further argued on behalf of the plaintiff that the purpose to export the property was an immaterial part of the contract, in that he could use it for any other purpose. The effect of defendant's argument is that such purpose was an irrevocable part of the contract and cannot be ignored, in the absence of a new contract. Plaintiff cites us to Chicago Daily News v. Kohler, 360 Ill. 351, 196 N. E. 451, in which the court stated that "conveyance or sale of property for a designated purpose or use does not necessarily amount to an agreement by the purchaser precluding its use for any other purpose * * * Courts are reluctant to enforce limitations and restrictions upon the purchaser's right

to use property once sold him and require unequivocal language to create such restrictions." The case is not in point. The use or purpose mentioned in that case is quite different from that in this case. There is no intimation in that case that the purpose might be tainted with illegality. It is doubtless true that in most instances, as has already been stated, the seller has no particular interest in the tastes, desires, needs or purposes which may have induced a purchaser to buy. But that cannot be said to be universally true. Thus it is held by the British and Canadian courts, and by some of the authorities in this country, that when the seller knows of an illegal purpose of the buyer, the contract becomes void even as to the former. Such, it is said, is not the general rule in this country, unless the seller does something in furtherance of the illegal purpose. Williston, supra, sections 1754, 1755; notes 53 A. L. R. 1364, 114 A. L. R. 370; see also Perko v. Rock Springs Com. Co., 37 Wyo. 98, 259 Pac. 520. And in Section 1757, Williston holds that in any case where the purpose is illegal, and the contract is executory, the seller may refuse to carry it out. Such holding, which has a bearing herein, is not without its reason, for knowledge of an illegal purpose of the buyer might not only hurt the conscience of the seller, if notwithstanding such purpose, the sale is consummated, but the seller might at times stand in danger, along with the purchaser, of becoming ensnared in the meshes of the criminal law. It is further held that when a sale of goods is made for the express purpose that they will be used for an unlawful design, the agreement is void. 13 C. J. 518, Sec. 478; 17 C. J. S. 681, subdivision c. According to the authorities already cited, the rule would be the same, if the contract becomes unlawful subsequent to the date of the contract. So that, since the face of the contract expresses a purpose which became illegal by reason of the presidential proclamations, it became prima facie

unenforceable, prima facie disabled the defendant to recover thereon, and prima facie, accordingly, authorized him to refuse to carry it out. How, then, could a court of equity, in the absence of some affirmative showing to overcome this prima facie situation, aid the plaintiff? The parties could have entered into a new contract, leaving out any illegal purpose. Williston, supra, Sec. 1760. That was not done. We need not decide whether or not a contract manifesting on its face a purpose in violation of the presidential proclamations, could be purged of such purpose unilaterally. And we may concede, for the purpose of this case, that if it appeared that neither the plaintiff nor the defendant,—or for that matter, the plaintiff alone—intended to export to Japan in violation of such presidential proclamations, the contract should not be held to be void. And counsel for plaintiff say that it so appears. They state "that the parties unconditionally and unqualifiedly waived the export contract provision." We find nothing in the record to justify that statement. It may be conceded that the defendant did not intend to export, or aid in the exportation of the goods to Japan, since he refused to deliver them to the plaintiff, but of course, nothing in that refusal could be construed as a waiver of the export contract provision. And we find no other waiver, unless, perchance, counsel refer to defendant's letter of March 1, 1941, in which the defendant asked that plaintiff take over the goods and close the contract. But that letter was not acted on, even if a waiver on defendant's part of the export purpose could be implied therefrom, which is doubtful. We turn, then, to the conduct of the plaintiff, and the consequences flowing therefrom.

Counsel for the plaintiff state in their brief—a fact, if it is a fact, not alleged in the amended petition—that the last of the first five tanks embraced within the contract, was delivered and paid for on or about Febru-

ary 10, 1941, after the embargo, it is stated, prohibiting shipments of steel tanks went into effect, and that this shows that plaintiff waived the export provision of the contract. We fail to see how any such waiver is shown thereby. And to make that still clearer, we should, in view of the fact that counsel for plaintiff have appealed to facts extraneous to the amended petition, be permitted to cite extraneous facts, but shown in the record before us, in contradiction of counsel's contention. The whole course of conduct of the plaintiff as shown by letters and telegrams in the record completely refute their contention, and convincingly shows that plaintiff still up to April 9 or 16, 1941, expected to ship the goods herein involved to Japan. On April 9, 1941, he, by letter, directed the defendant to ship the property in question to a warehouse in Casper. We need not mention the fact that the "call" was not in conformity with the contract, and that the one actually made, might, in view of the telegram of the same day, cause the defendant to have some misgivings. Nothing contained in the letter indicates that the plaintiff renounced (or waived) the purpose to export the property to Japan. Shipment to him at Casper might have been but the first step to carry out the ultimate shipment to the destination mentioned in the contract. In view of the fact that defendant was involved in the purpose to ship the goods to Japan as much as the plaintiff, and in view of the fact that the policy of the Government had by that time apparently become reasonably clear as to steel, it would seem that fairness to him required that plaintiff should have made his position clear, so that the defendant could feel assured—no matter how he may have felt previously, when, perhaps, the policy had not become as fixed as then—that he would not be involved in any way in any act in contravention of the presidential proclamations. The amended petition in this case, or for that matter any-

thing else in the record, fails to contain a statement that plaintiff renounced (or waived) his purpose to export to Japan. Hence the difficulty of understanding the assertion that the parties unconditionally and unqualifiedly waived the export provision. The only possible claim which counsel could make, and which they do not make, is that there is a presumption that a man will not act illegally. 31 C. J. S. 770. But that rule must be construed in conjunction with the rules governing specific performance. In the case at bar, the contract, as already stated, on its face was one for the export of goods to Japan; plaintiff's business as also shown by the contract, was that of an exporter, not that of a seller to parties in this country of goods bought here; plaintiff had, as already shown, and as indicated by the amended petition, sold the goods in question to purchasers in Japan; no allegation is found that he wanted to sell them or had sold them to any one here. Under these circumstances and the other facts already discussed, the presumption above mentioned must, we think, give way, and it was plaintiff's duty, we think, in a case such as before us, to show to the court that his intentions were not in contravention of the policy of our government. He did not do so. He came into a court of equity. It was his duty to come with clean hands. He did not show that they were clean. Remedy by specific performance is not a remedy of right, but rests in the sound discretion of the court. 58 C. J. 855-857; Sec. 98-1603, Rev. St. 1931. It was incumbent on the plaintiff to show to the court the equities which entitled him thereto, and the discretion of the court should not, particularly in a case such as is before us, be exercised unless the case is clear. Smith v. Stewart, 245 Mich. 452, 222 N. W. 713. The trial court evidently took the view that these rules had not been met. Taking into consideration all that we have said, we find no sufficient reason to disagree with it.

That is, of course, so much more true, if we view the case as of the present time. Plaintiff evidently demanded the delivery of the property with the hope or expectation to be able to export the property to Japan at some time. The war has, of course, ended that hope or expectation. The judgment of the trial court must, accordingly, be affirmed.

*Affirmed.*

RINER, Ch. J., and KIMBALL, J., concur.