Robert D. McCARTNEY, d/b/a McCartney Realty, and Van LeMaster, Agent for McCartney Realty, Appellants (Plaintiffs),

v.

Kent W. MALM and Linda L. Malm, Appellees (Defendants).

No. 5412.

Supreme Court of Wyoming.

April 16, 1981.

Rehearing Denied May 6, 1981.

signed the brief and appeared in oral argument on behalf of appellants.

James L. Applegate and Alan B. Minier, of Hirst & Applegate, Cheyenne, signed the brief and appeared in oral argument on behalf of appellees.

Before ROSE, C. J., RAPER, THOMAS and ROONEY, JJ., and O'BRIEN, District Judge.

ROONEY, Justice.

This appeal is from a judgment which denied the appellants-plaintiffs' recovery of a real estate commission on the sale of appellees-defendants' 245-acre farm near Pine Bluffs. Appellant McCartney is a licensed real estate broker in Cheyenne. Appellant Van LeMaster is McCartney's sales agent. Appellee Kent Malm executed an agreement with appellant McCartney on December 15, 1978, which gave appellant McCartney the exclusive right to sell the farm during a six-month period. The farm was sold on December 3, 1979. This action was instituted to recover a commission under such agreement. The district court held that the agreement had expired by its own terms, and that a purported "extension clause" in it was meaningless and unenforceable.

Appellants present two arguments. They contend that the "extension clause" in the agreement should have been interpreted to require payment of the commission and that the commission was properly payable even without an "extension clause."

We affirm.

After the listing agreement was executed [1], appellants advertised the property as being for sale. Michael W. Kelly of Kelly Ranch Corporation (hereinafter referred to as Kelly) made inquiry as a result of a newspaper advertisement, and he indicated a desire to purchase. A price of $275,000.00 was agreed upon, but, for tax and other purposes, Kelly wanted to trade a

Franklin D. Bayless, of Trierweiler, Bayless, Barrett & McCartney, Cheyenne,

---

1. The agreement is set out in full, infra.

ranch near Iron Mountain for appellees' property. Appellees had a need for cash to pay existing debts and could not accept the trade. Therefore, Kelly, through his broker, initiated an effort to find a buyer for the Kelly property and, thus, make possible a three-way transaction.

In June 1979, Kelly's broker located a potential buyer for the Kelly property. The buyer eventually refused to execute a purchase agreement, but in anticipation of such purchase, Kelly and appellees executed an option agreement which outlined the proposed three-way transaction. The option agreement was signed July 11, 1979, twenty-six days after expiration of the listing agreement. The option was to expire on September 1, 1979. Appellants were designated escrow agents under it. As part of the escrow, Kelly's note for $10,000.00, payable October 1, 1979 to appellees, was deposited with appellants.

After the three-way transaction failed and after the option expired, appellees, as lessors, and Kelly, as lessee, agreed to a lease of appellees' farm. Appellants were not advised of the lease but were told by appellees that the farm was being taken off the market. Appellee Kent Malm testified that at the time he did not believe a sale to Kelly was possible. The consideration for a one-year term of the lease was $28,000.00. The escrowed note for $10,000.00 was accepted by appellees as part payment. When appellees removed the note from appellants' possession, appellees offered to pay appellants 7 percent of the amount of the note. Appellants refused the offer inasmuch as there had not been a sale. The lease provided that Kelly would have the right of first refusal upon the sale of the property by appellees.

Without knowledge of appellants or appellees, Kelly continued efforts to find a party with whom an exchange transaction could be arranged. Such was done with the help of other real estate brokers. On No-

vember 5, 1980, an agreement was executed under which appellees would exchange their property for Kelly's Iron Mountain property and then exchange the Iron Mountain property for Colorado property of a third party. The Colorado property would be sold to a fourth party, resulting in appellees receiving $275,000.00 in cash. The transaction was completed in December 1979. The warranty deed transferring appellees' Pine Bluffs property to Kelly was signed on December 3, 1979 and recorded December 10, 1979.

Upon learning of the transfer, appellants demanded payment of a commission on the sale of the Pine Bluffs property, contending that the listing agreement contained a six-month "extension clause" which would not expire until December 15, 1979, and that the commission was due under such clause. The request was refused, and this action was initiated.[2]

## APPLICABILITY OF THE "EXTENSION CLAUSE"

The trial court found that the agreement was adopted by the parties as a completely integrated agreement; that any ambiguity must be construed against the party who drafted it, and that:

" * * * The plaintiff's claimed right to a commission in this case is based upon the third paragraph of this printed material on the reverse side of the listing agreement. In reading the third paragraph, it is obvious that the same is not a complete sentence, contains no operative verb nor does it impose any obligation on a party or provide for any result to flow from the conditions recited in the dependent clause."

The agreement was on a preprinted form prepared by appellant McCartney without assistance of legal counsel. Our discussion of this issue will be simplified by setting out the agreement in full. Front page:

---

2. The complaint also named Kelly as a defendant, but it was dismissed as against Kelly just before trial pursuant to stipulation of the parties.

## McCARTNEY REALTY
Cheyenne, Wyoming

Owner _Kent Maln_ Realtor _McCartney Realty_

Date _Dec. 15, 1978_ Salesman _Van Lancaster_

Address _Pine Bluffs Wyo Kent_ Price $ _300,000.00_

| | |
|---|---|
| Garage size _____ | Building Size _____ Age _____ |
| Lot size _____ | Total Rooms _____ No. Baths _____ |
| Siding Type _____ | No. Bedrooms _____ Basement _____ |
| Color _____ | Plaster _____ Drywall _____ |
| Trim Color _____ | Fireplace _____ |
| Roof Type _____ | Kitchen Size _____ Builtins _____ |
| Roof Material _____ | Cabinets _____ Counter _____ |
| Street _____ | Dining Rm. _____ Living Rm. _____ |
| Water _____ | 1st Bedroom _____ 2nd Bedroom _____ |
| Storm Windows _____ | 3rd Bedroom _____ 4th Bedroom _____ |
| Outbuildings _____ | Floors _____ Carpeting _____ |
| Garages _____ | Finished Basement _____ |
| Driveway _____ | Drapes _____ Lr. _____ Br. _____ |
| Sewer _____ | Type Heat _____ |
| Gas _____ | Hot Water Heater _____ Gal. _____ |
| Yard Fenced _____ | Shower _____ Yes _____ No _____ |
| Landscaping _____ | Legal Description _____ |
| TV Antenna _____ | |

Annual Taxes _$1400.00_

Title, Ins. or Abst. _____

Fin. Pres. Loan $ _____ Rate _____ % Payments _____

Mortgagee _____

2nd Mortgage _____ Rate _____ % Payments _____

Owner will carry _____ at _____ per month at _____ %

Loan Commitment FHA-VA-CONV. $ _____

Valuation $ _____ Years _____ Rate _____ %

Mortgagee _____ Occupant _____

Rent $ _____ Appointment: _____ Phone _____

Location of key or key box
Undersigned OWNER(S) hereby give and grant to the REALTOR named herein the exclusive right to sell above described property in accordance with the listing terms set forth on the REVERSE SIDE HEREOF, which we have read and with which we are familiar. _Vega (702) 871-4096_

Owners Phone _Ph. (602) 997-9331_ Owners Address _____

OWNER _Kent Maln_ OWNER _____

_The Commission on this sale will be 7%_

---

Back page:

"EXCLUSIVE RIGHT TO SELL LISTING

"In consideration of your efforts to sell and re-list with McCartney Realty in accordance with their rules and regulations, Owner(s) hereby give and grant to the listing REALTOR named on the reverse side hereof the exclusive right and authority to sell and offer for sale, including the inspection and showing thereof, terms and possession thereon specified, for a period of six (6) months from date hereof; providing, however, that the Owner(s) may cancel this listing by giving a 10 day written notice of such cancellation to the listing Broker at any time from and after sixty (60) days from date hereof.

"McCartney Realty regulations provide that all listings must terminate within six

months from date, which regulation will automatically cancel this listing six (6) months after date of execution.

"Whether such sale be made by the listing REALTOR or by any other Real Estate office, or by themselves, or by any other person acting in their behalf, or if the property is afterwards sold within six (6) months from the termination of this agency to a purchaser to whom it was submitted by listing REALTOR or any other REALTOR, and whose name has been disclosed to them.

"In event of such sale Owner(s) agree to furnish Buyer either an Abstract of title extended to date of Buyers Offer of Purchase, showing merchantable title in them or a title insurance policy in full amount of the sale price, and to convey said property by Warranty Deed. Owner(s) further agree to prorate the payment of general taxes for the current year as of the date of closing of the encumbrances, rents and insurance premiums be likewise prorated.

"Plural pronouns shall be read as singular when this agreement is signed by one person."

■ Clearly, the district court was correct in holding that the third paragraph on the back page of the agreement (hereinafter and heretofore referred to as "extension clause") is devoid of meaning.[3] It does not direct the payment of a commission upon the existence of its circumstances.

Whether or not the "extension clause" is so devoid of meaning as to not even qualify as ambiguous need not be determined. It is only part of a contract, and we must look at the contract as a whole in an effort to ascertain whether it reflects a meeting of the minds of the parties and whether or not their intent can be ascertained therein. " * * * Whether ambiguity exists is a question of law. *Redding Foods, Inc. v.*

*Berry*, Tex.Civ.App., 361 S.W.2d 467 (1962); *Bosler v. Coble*, 14 Wyo. 423, 84 P. 895 (1906). We are, therefore, at liberty to make a determination as to the existence of ambiguity whether or not the parties here agree thereto one way or the other, and whether or not the trial court has reached a conclusion thereon one way or the other.

" * * * Even if there be an ambiguous term or portion of the contract, extrinsic evidence is not considered if the meaning of the ambiguous term or portion of the contract can be ascertained from other language of the contract, i. e., from the contract as a whole. * * * " *Amoco Production Company v. Stauffer Chemical Company of Wyoming*, Wyo., 612 P.2d 463, 465–466 (1980). See Restatement of Contracts Second, Tentative Draft No. 5, § 238 Comment *d*; 17A C.J.S. Contracts § 617.

"While the court will not ignore the grammatical construction of the language used, such construction of a contract will not be followed if a different construction will better give effect to the parties' intention." 17A C.J.S. Contracts § 305, p. 158. 17 Am.Jur.2d Contracts § 278.

■ Appellants point to the language on the front page of the agreement and to the bold print heading on the back page of it, both of which refer to the "exclusive right to sell," and they suggest that such words should be incorporated into the "extension clause." It may be possible to shuffle the paragraphs and words of the agreement and produce the language desired by appellants. Additionally, one with knowledge of the general practice in the industry could anticipate the clause to be an effort to protect appellants from losing the fruits of their labors on a sale which resulted from their having procured a ready, able and willing buyer, but which sale was not con-

---

3. A legal or otherwise identifying description of the property is lacking. The commission amount is inserted after the signature, and it does not reflect if it will be 7 percent of the selling price, the listing price, the seller's equity or other reference. The obligation imposed on McCartney is "to sell and offer for sale" and not the obligation usual to most of such agreements to the effect that the commission is earned when a buyer is procured who is ready, willing and able to purchase on the recited terms or on more advantageous terms. The agreement was signed by only one of the two owners of the property.

summated until after expiration of the listing period. Such clauses are common in real estate listing agreements. Although we cannot assume that appellees had knowledge of such, the agreement as a whole can be said to be ambiguous under our accepted definition:

> " * * * an agreement which is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present. * * * " *Bulis v. Wells*, Wyo., 565 P.2d 487, 490 (1977). And see *Meuse-Rhine-Ijssel Cattle Breeders of Canada Ltd. v. Y-Tex Corporation*, Wyo., 590 P.2d 1306 (1979); *Amoco Production Company v. Stauffer Chemical Company of Wyoming, supra*.

Thus, we examine the entire agreement in an effort to ascertain the intent of the parties.

> " * * * The primary rule of contract construction is to give effect to the intentions of the parties expressed by the language they employ. * * * " *Quin Blair Enterprises, Inc. v. Julien Construction Company*, Wyo., 597 P.2d 945, 951 (1979). *Amoco Production Company v. Stauffer Chemical Company of Wyoming, supra*; 17 Am.Jur.2d Contracts § 244.

As already noted, the entire agreement can be rearranged to reach the conclusions desired by appellants and as probably intended by appellants. But to be effective, it must also be the conclusions as reasonably understood and intended by appellees.

> "A common intention, a meeting of the minds, on all the terms thereof, is essential to an agreement; and no portion of the terms may be left unsettled." 17 C.J.S. Contracts § 31, p. 635.

> "It has been said that the standard of interpretation of a written instrument, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to such instrument by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the written instrument, other

than oral statements by the parties of what they intend it to mean. Similarly, it has been held that the law of contracts does not judge a promisor's obligation by what is in his mind, but by the objective test of what his promise would be understood to mean by a reasonable man in the situation of the promisee. * * * " 17 Am. Jur.2d Contracts § 243, p. 630.

■ To resolve an ambiguity, resort may be had to competent evidence of extraneous circumstances. *Goodman v. Kelly*, Wyo., 390 P.2d 244 (1964); *Amoco Production Company v. Stauffer Chemical Company of Wyoming, supra*. Appellants point to testimony of appellant McCartney to the effect that he had read and explained the agreement to appellee Kent Malm at the time it was executed and that Malm responded "yes" to an inquiry "if he understood it" as evidence that the "extension clause" was intended by all parties as now desired by appellants. Appellee Kent Malm could not recall whether or not there was any explanation of the clause. He testified that he believed the term of the listing agreement had expired prior to the subsequent sale of the property.

■ Whether or not the meaning that appellants desire to give to the agreement was conveyed to appellee Kent Malm was a question of fact for the trial court. *Madrid v. Norton*, Wyo., 596 P.2d 1108 (1979). The trial court did not make specific findings in this regard, but it did find that there was no evidence of any collusion between appellees and others designed to deprive appellants of their commission, and it found that there was no evidence of bad faith on the part of appellees "at any time in this transaction." Implicit in the finding of no bad faith is the conclusion that appellees did not understand that the agreement provided for payment of a commission upon sale of the property after expiration of the listing period.

> " * * * 'Good faith consists in an honest intention to abstain from taking any unconscientious advantage of another, even through the forms or technicalities of law, together with an absence of all information or belief of facts which would

render the transaction unconscientious.' * * * " *Cone v. Ivinson*, 4 Wyo. 203, 33 P. 31, 34 (1893) quoting from *Gress v. Evans*, 1 Dak. 387, 46 N.W. 1132 (1877); *Wendling v. Cundall*, Wyo., 568 P.2d 888, 890 (1977); see 12 Am.Jur.2d Brokers §§ 100 and 167.

It is one thing to interpret a contract or to discern the contractual intent of the parties pursuant to established legal rules, but it is another thing to make a contract for the parties. We are obliged to do the former, and we are prohibited from doing the latter.

"Courts may not rewrite contracts under the guise of interpretation. * * * " *Quin Blair Enterprises, Inc. v. Julien Construction Company, supra*, 597 P.2d at 951 (1979).

The evidence as reflected in the record does not warrant the conclusion that appellees intended the listing agreement to be effective beyond its six-month term. The language of the agreement itself is not sufficient to convey such to a reasonably intelligent person—at least, not with sufficient specificity to allow for enforcement thereof. The acceptance of appellants' contention would amount to a rewriting of the contract.

Finally, any ambiguity in the contract must be resolved against appellants as authors of the instrument.

"To the extent that a contract is susceptible of two constructions by reason of doubt or uncertainty as to the meaning of ambiguous language, it is to be construed most strongly or strictly against the party by whom, or in whose behalf, the contract was prepared or the ambiguous language was used, and liberally and most strongly in favor of the party who is not the author, and not responsible for the use, of the language giving rise to the doubt or uncertainty." 17A C.J.S. Contracts § 324, p. 217. See *McGinnis v. General Petroleum Corporation*, Wyo., 385 P.2d 198 (1963).

"Any ambiguity in a broker's contract with respect to his right to commission will be resolved against him where he prepared the contract. * * * " 12 Am. Jur.2d Brokers § 33, p. 797. See *Goodman v. Kelly, supra; Boutelle v. Chrislaw*, 34 Wis.2d 665, 150 N.W.2d 486 (1967).

Appellants were not entitled to a commission for the sale of appellees' property by virtue of the "extension clause" in the listing agreement.

## COMMISSION BASED ON PROCURING CLAUSE

As support for their second argument on this appeal, i. e. the commission was properly payable even without the "extension clause" in the listing agreement since appellants were the procuring source of the sale, appellants single out our holding in *Owens v. Mountain States Telephone & Telegraph Co.*, 50 Wyo. 331, 63 P.2d 1006 (1936), and cite the following therefrom at page 1012 of 63 P.2d:

"We have heretofore mentioned cases which hold that if a broker finds a customer within the time given him, the fact that the sale is completed subsequently will not deprive him of his commission. If the contract here was as claimed by plaintiff, namely, that he was to find a purchaser within a certain time, at a price satisfactory to the owner, it is clear that the contract does not, in terms, require acceptance of the offer and the completion of the sale unless that be by construction. Now, if a broker is the procuring cause of a sale—and the jury in this case were clearly warranted in finding that to be true—then we see no good reason why we should, by mere interpretation, insert in a contract conditions and terms not clearly inserted therein by the parties themselves. In other words, where the owner receives and appropriates to his own use, the benefit of the efforts of a broker, no sound reason exists why courts should construe the contract strictly in favor of the owner. It is held that wherever there is justification for treating the broker as the procuring cause of sale, his services are regarded as highly meritorious, and the law leans to

that construction of the contract and to that interpretation of the facts of the case and the acts of the parties which will best secure to the broker the payment of his commissions. * * * *"

However, the foregoing language was with reference to a listing contract which called for the broker to find a ready, able and willing purchaser and not to a listing, as here, which called for the broker to make a sale. The distinction was pointed out by the court in the *Owens* case at page 1010 of 63 P.2d:

" * * * A broker, it has been said, 'whose undertaking merely is to find a purchaser * * * at a price which shall be satisfactory to the seller when he and the purchaser meet, is in reality only a "middleman," whose duty is performed when the buyer and seller are brought together.' [Citations omitted.] In the case of *Miller v. Stevens*, 23 Ind.App. 365, 55 N.E. 262, 264, the court said: 'There is a marked difference between a contract by a broker to furnish a purchaser to his principal, and a contract to effect a purchase or sale. *In the first instance the broker has earned his commission when he has introduced and brought together the principal and the proposed purchaser, between whom a deal is perfected, and in the second instance it is the duty of the broker to perfect a sale upon the prescribed terms* submitted to him by the principal, before he is entitled to his commission.' " (Emphasis supplied.)

In fact the very language quoted by the appellants makes clear that the court was referring to an ordinary listing contract. The qualifying sentence reads:

" * * * If the contract here was as claimed by plaintiff, namely, *that he was to find a purchaser within a certain time*, at a price satisfactory to the owner, it is clear that the contract does not, in terms, require acceptance of the offer and the completion of the sale unless that be by construction. * * * *" (Emphasis supplied.)

The parameters of the broker's obligation in a contract to sell has been described as follows:

"When property is put in the hands of a broker for sale on stated terms, the broker does not often promise to procure a purchaser within any stated time. If no time limit is set by the owner, the power of the broker to earn his commission by finding a ready and willing purchaser is limited to a reasonable time. Very often, however, the owner names a definite period within which the broker must find the purchaser. Such is the case when the owner says: 'I put the property in your hands for the next 60 days;' or 'I will pay you a 5 per cent commission if you make a sale on my terms by May 1.'

"When such a time limit is thus set by the owner, time is of the essence; that is, the agent must consummate the sale on the stated terms within the period of time limited by the owner. It is not enough that the agent found the buyer, stated the terms of sale to him, and introduced him to the owner within the limited period. No commission will be payable to the broker for this. *To earn the commission, the buyer must, within the time limited, accept the owner's offer to sell on the stated terms; and he must be ready and able to pay the price.*

"In these cases the owner offers his promise of a commission to the broker, the latter's power of acceptance to be exercised by the actual finding of a purchaser ready and willing to buy on the owner's stated terms. A unilateral contract between owner and broker is consummated by the acceptance. In all cases, *when an offeror expressly limits the time for acceptance the offeree's power ends promptly at the specified time.* Action by the broker may cause the owner's offer to be irrevocable during the time specified; but he can not by such action extend the duration of his power.

"The power of the broker may be extended by the owner, either by words expressing such an intention or by permitting the broker to proceed with negotiations in the justified belief that the time is so

extended. *The owner does not become bound to pay the commission merely by reason of his own action in completing the sale after the broker's time limit has expired,* even though the broker's earlier negotiations with the purchaser may have been very helpful to the owner. * * * " (Emphasis supplied.) 3A Corbin on Contracts § 717, pp. 370–371 (1960).

The application of this limitation to appellants' rights under this agreement is supported by this description of an exclusive right to sell:

"As a general rule, a broker who has been granted either an exclusive agency or an exclusive right to sell or lease property is entitled to a commission, at least by way of damages, on a sale or lease by or through another broker *during the existence of the first broker's exclusive agency or right.* Also, a broker who has been given an exclusive right to sell or lease property is entitled to a commission, at least by way of damages, on a sale or lease by the owner himself, without the aid or intervention of any broker, *within the time specified in the contract of employment.*

\* \* \* \* \* \*

"To entitle a broker who has an exclusive agency or exclusive right to sell to a commission, a transaction effected by the principal himself or through another broker must be of the nature contemplated by the agreement. *The sale or other transaction must occur within the time when the exclusive agency or right to sell exists,* but the conclusion within that time of a contract is sufficient, even though a formal transfer of the property does not occur until later. * * * " (Emphasis supplied.) 12 C.J.S. Brokers § 175, pp. 555, 559. See also, 12 Am.Jur.2d Brokers § 220. Annotation: Brokers right to commission on sales consummated after termination of employment, 27 A.L.R.2d 1348 (1953); *Diehl & Associates, Inc. v. Houtchens,* 173 Mont. 372, 567 P.2d 930 (1977).

 Under the listing agreement the commission would be earned only if a sale

were made during its term. Such was not here done. But even if the listing agreement were the more usual type and provided for payment of the commission upon the finding of a ready, able and willing buyer, it would have been difficult in this case for the trial court to have found appellants to have been the procuring cause of the sale to the extent necessary to entitle them to a commission. The evidence was substantial that appellees had concluded that appellants were not able to bring about an exchange with the Kelly property, and that the final exchange arrangement was accomplished by other real estate brokers. Where several brokers are involved, the commission is to be paid to the one who can show that his efforts were the efficient, predominating and procuring cause of the sale. There cannot be multiple procuring causes. The broker bringing about the meeting of minds and making it possible for the transaction to be consummated is entitled to the commission. See 12 Am.Jur.2d Brokers § 230; 12 C.J.S. Brokers § 171; *Reed v. Taylor,* 78 Wyo. 216, 322 P.2d 147 (1958). Viewing the evidence under the following standard, as we must, it does not reflect that appellants were the efficient, predominating and procuring cause of the sale:

"* * * [W]e must assume that the evidence in favor of the successful party is true, leaving out of consideration entirely the evidence of the unsuccessful party that conflicts with it, and giving to the evidence of the successful party every favorable inference which may reasonably and fairly be drawn from it. * * * " *Jelly v. Dabney,* Wyo., 581 P.2d 622, 624 (1978); *Madrid v. Norton, supra.*

Further, the evidence viewed under this standard supports the finding by the trial court of good faith on the part of appellees.

Affirmed.