**RAINBOW OIL COMPANY,**
Appellant (Defendant),

v.

**John J. CHRISTMANN, Margaret Roden, Vernon Delgado, Barbara McKinley and Stuart McKinley, MGF Oil Corporation, and Sublette Properties, Inc., Appellees** (Plaintiffs).

No. 5734.

Supreme Court of Wyoming.

Dec. 29, 1982.

Robert J. Pickett of Pickett, McKinney & Smith, Rock Springs, and John S. Pfeiffer of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for appellant.

John C. Brooks and J.E. Vlastos of Vlastos, Reeves & Murdock, Casper, for appellees.

Before ROSE, C.J., RAPER, THOMAS and ROONEY, JJ., and SAWYER, District Judge.

ROSE, Chief Justice.

The present dispute arises out of a contractual relationship between Rainbow Oil Company,[1] the appellant, and John J. Christmann,[2] one of the appellees, in which Christmann brought suit seeking specific performance of the contract. Rainbow responded charging Christmann with breaching the agreement and seeking its reformation. In its judgment, the district court ordered specific performance, refused to reform and found generally in favor of the appellee and against the appellant in all respects. It is from this judgment that Rainbow Oil Company appeals.

### THE FACTS

Rainbow Oil Company is, and at all times pertinent to this litigation was, the owner of federal oil and gas lease Number W–0131513 in the Labarge field located in Lincoln County, Wyoming. In early 1973, Rainbow was advised by the United States Geological Survey (U.S.G.S.) that this lease was subject to forfeiture if Rainbow did not undertake a program of reworking and modernizing its operations. At that time ten wells were in place on one-half of the quarter section covered by the lease. These wells had been drilled in the 1920's and by the early 1970's they were in a state of disrepair with only eight of them producing oil. We will refer to this part of the leasehold as "Old Rainbow."

Being in poor financial condition and unable to comply with the U.S.G.S. directive, Rainbow sought to sell its interest in the lease and, to this end, the appellant's president, Jeanne Cailliez, retained appellee Stuart McKinley to assist in finding a buyer for the property. While Mr. McKinley was searching for potential buyers, he was contacted by John B. Roden who inquired about the availability of the property. Ro-

---

1. Sometimes referred to as Rainbow in this appeal.

2. Sometimes referred to as Christmann in this appeal.

den was the chief executive officer of Roden Drilling Company and Big Springs Exploration, Incorporated, the former being a wholly owned subsidiary of the latter. John Roden's interest in the lease was shared by appellee Vernon Delgado who was the president of appellee Sublette Properties, Incorporated and, through the efforts of Roden and Delgado, Mr. Christmann was contacted about the leasehold. Mrs. Cailliez knew of the mutual interest which Delgado, Roden and Christmann shared with respect to the Rainbow property, and meetings were held to discuss possible participation of these individuals concerning the development of the Rainbow lease.

Rainbow Oil Company entered into a farmout agreement with John Christmann on August 26, 1975 according to the terms of which Christmann was to drill some test wells on the undeveloped portion of the lease, after which he would assume operating control of "Old Rainbow" for the purpose of reworking and modernizing the ten existing wells. It was the purpose of Rainbow to have the leasehold developed in accordance with the U.S.G.S. directive while minimizing the financial risks associated with such a program. It was Christmann's intent to formulate an agreement which would allow him to become the sole operator of the Rainbow properties. These objectives formed the basis of the contract between the parties.

THE CONTRACT

The farmout agreement executed in August of 1975 provided:

"1. We agree to commence by Sept. 15, 1975 the drilling of a well to test the recently developed sand on the Texaco lease at approximately 1,600' which offsets this acreage to the north. This well is to be an offset to the Texaco well. Upon completion of the above well we agree to drill two additional wells in the south one-half of the lease, at locations of our choice, to test the same pay section. These wells to be drilled at the sole cost, risk and expense of the operator, thereby earning for the operator all rights down to 100' below the deepest well drilled, and include the right to produce from any commercially productive zone penetrated.

"2. When the operator of the above wells has received from their production an amount equal to the cost of drilling, equipping and producing them, Rainbow Oil Co. will be entitled to 25% of the net profit derived from the production. Should prudent operation dictate the drilling of more than the three obligation wells, the additional wells will be drilled on the same basis. Allowable production expense items will include production taxes, royalties, lifting cost (field expenses) and the standard monthly per well overhead charge (for bookkeeping, accounting and auditing).

"3. We agree that as soon as Roden Drilling Company has finished their present drilling for Belco we will use their rig and drill a well at a legal location on the above lease to test the Bear River formation at approximately 8400' which will earn for the operator all rights down to 100' below the depth drilled. Said well to be drilled in a good and workmanlike manner, completed as a producer, or plugged and abandoned at our sole cost, risk and expense.

"4. When the operator has recovered the cost of drilling, equipping and producing the above well from the production therefrom, Rainbow Oil Company will be entitled to 25% of the net profits therefrom.

"5. Upon completion of the above drilling program we agree to take over operation of Rainbow Oil Company's ten wells and initiate a program of reworking, deepening, redrilling or other accepted oil field operations which, in our sole judgment, will produce the greatest ultimate return from the property. This program will be at the sole cost, risk, and expense of the operator. The operator will be allowed to recover the cost of this project out of one-half of the net income from these ten wells with the other one-half going to Rainbow Oil Co. Upon recovery by the operator of his cost of reworking, equipping and producing the ten wells,

Rainbow Oil Company will thereafter be entitled to 25% of the net profit therefrom.

"6. If any of the parties of interest herein elect to sell their interest, the party so inclined shall get a bona fide offer in writing from the prospective purchaser. This written offer shall be submitted to the other parties of interest who shall have 30 days of prior right to purchase said interest at the same figure.

"7. Rainbow Oil Company or their representative shall have access to all operations conducted on the lease and will receive daily drilling reports and copies of all cores, tests and logs which are made by the operator, access to all financial records, and the right to request an audit by a recognized firm.

"8. It is agreed by all of the parties hereto that Mr. Stuart M. McKinley or Barbara C. McKinley is to receive an overriding royalty of 2% for Mr. McKinley's services in consummation of this agreement.

"9. If the above constitutes your understanding of our agreement, please so indicate by signing in the space provided below and returning three copies to the undersigned. This agreement shall be binding upon the heirs, successors, and assigns of all parties hereto."

As can be seen from the above, the farmout agreement first required that Christmann and his partners[3] drill three wells on the undeveloped south one-half of the leasehold which we will hereafter call the "New Rainbow." The operator was also required to drill one gas well in the "New Rainbow" area. These wells were in fact drilled and, under a subsequent agreement between appellant and appellee Christmann, 16 oil wells were drilled on "New Rainbow" all of which were producers. This drilling program was completed by June of 1978. As the contract reveals, after completion of the drilling program on "New Rainbow," the operator Christmann was to take over the ten existing wells on "Old Rainbow" for the purpose of carrying out a rework program. This provision was calculated to satisfy the U.S.G.S. directive issued to Rainbow Oil Company in 1973.

It is to be recalled that the contract further provides that each of the parties is given a right of first refusal which purports to afford each party the opportunity to purchase the interest of any party or interest owner who decides to sell. The parties also provided for a 2% overriding royalty to be conveyed to Stuart McKinley as consideration for his services in assisting in the formulation of the agreement. Finally, it was the purpose of the agreement to relieve Rainbow Oil Company of the financial risks associated with development, while also guaranteeing the company a 25% share in the proceeds.[4]

## APPELLANT'S CONTENTIONS

Problems arose when Rainbow Oil Company refused to relinquish control of "Old Rainbow" to Christmann after his drilling program on "New Rainbow" was completed in June of 1978. Rainbow Oil Company's financial condition had improved while Christmann and associates were discharging their obligations on "New Rainbow," thus enabling Rainbow Oil to do some reworking and redrilling on "Old Rainbow." Christmann made at least four demands on Rainbow Oil in an effort to enforce his right to control "Old Rainbow" once his drilling program on "New Rainbow" was finished, but all were refused, whereupon he stopped payment to Rainbow Oil of its share of the proceeds being derived from the production on "New Rainbow." Christmann then brought the present action seeking specific performance of the agreement and, as mentioned previously, Rainbow Oil Company

3. The partners were Vernon Delgado and John Roden each of whom owned a one-third interest in the agreement.

4. Christmann testified at trial that, although the normal farmout provides for a 50–50 split, the agreement between him and Rainbow Oil Company provided for a 25–75% arrangement because of appellant's wish that appellees bear all of the risks and costs associated with the venture.

counterclaimed, alleging that Christmann, Delgado and Roden had breached the contract by violating the "right of first refusal" clause, and charged that other provisions of the contract had not incorporated the entire agreement which failure called for relief in the form of reformation of the contract. Specific performance was ordered and all of appellant's claims were rejected by the trial judge. Appellant therefore frames the issues for review as follows:

"A. The Court Erred In Finding That The Transfers Of The Interests of Christmann, Roden, Delgado and Roden Drilling Company Were Not Sales Within The Meaning Of The Farmout Agreement. The Transfers Of These Interests Constituted Material Breaches Of The Agreement Thereby Excusing Appellant From Further Performance Thereunder.

"B. The Court Erred In Denying Reformation Of The Farmout Agreement.

"C. The Court Erred In Granting Appellees Specific Performance Of The Agreement Due To Appellees' Material Breaches Of The Agreement And the Doctrine Of Estoppel.

\* \* \* \* \* \*

"D. The Court Erred In Construing The Farmout Agreement And In Its Accounting.

"E. The Court Erred In Concluding That McKinley Is Entitled To A Two Percent Overriding Royalty On The Old Rainbow And That Rainbow Oil's Interest Is Burdened By Any Override He May Have.

"F. The Court Erred In Refusing To Accept Offered Evidence."

We will affirm.[5]

## CONTROLLING PRINCIPLES

▋ This case involves the interpretation of a contract and we are therefore bound by the principles set out in *Amoco Production v. Stauffer Chemical*, Wyo., 612 P.2d 463, 465 (1980), where we said:

"Our basic purpose in construing or interpreting a contract is to determine the intention and understanding of the parties. *Fuchs v. Goe*, 62 Wyo. 134, 163 P.2d 783 (1945); *Shellhart v. Axford*, Wyo., 485 P.2d 1031 (1971); *Oregon Short Line Railroad Company v. Idaho Stockyards Company*, 12 Utah 2d 205, 364 P.2d 826 (1961). If the contract is in writing and the language is clear and unambiguous, the intention is to be secured from the words of the contract. *Pilcher v. Hamm*, Wyo., 351 P.2d 1041 (1960); *Fuchs v. Goe*, supra; *Hollabaugh v. Kolbet*, Wyo., 604 P.2d 1359 (1980); *Wyoming Bank and Trust Company v. Waugh*, Wyo., 606 P.2d 725 (1980). And the contract as a whole should be considered, with each part being read in light of all other parts. *Shepard v. Top Hat Land & Cattle Co.*, Wyo., 560 P.2d 730 (1977); *Rossi v. Percifield*, Wyo., 527 P.2d 819 (1974); *Shellhart v. Axford*, supra; *Quin Blair Enterprises, Inc. v. Julien Construction Company*, Wyo., 597 P.2d 945 (1979). The interpretation and construction is done by the court as a matter of law. *Hollabaugh v. Kolbet*, supra; *Bulis v. Wells*, Wyo., 565 P.2d 487 (1977); *Shepard v. Top Hat Land & Cattle Co.*, supra."

It is also to be noted that an ambiguity permitting the use of extrinsic evidence is not necessarily created merely because the contracting parties later find themselves in a dispute as to the meaning of their agreement, *Amoco Production v. Stauffer Chemical*, supra. If, upon considering the contract as a whole, the meaning of an arguably ambiguous term can be ascertained, then we will not resort to the use of extrinsic evidence. *Quin Blair Enterprises, Inc. v. Julien Construction Company*, Wyo., 597 P.2d 945 (1979).

Here, the appellant contends that the contract in several respects fails to reflect the total agreement and intention of the parties. We, however, adopt the view of the trial court that the farmout agreement was forged as a result of negotiation and fair dealing, and the language of that in-

---

5. Any other relevant facts will be alluded to in the course of the opinion.

strument is clear, unambiguous, and represents the entire agreement. We will therefore review each of the issues raised by appellant with the above rules of law and findings in mind.

## APPELLANT'S CLAIM OF BREACH

█ The argument which appellant most strenuously relies upon is the claim that Christmann, Roden and Delgado breached paragraph number 6 of the contract, which paragraph gives the parties to the agreement a right of first refusal of any offer to purchase a party's ownership interest in the lease. Appellant argues that the several transfers which occurred were in fact sales, as that term is contemplated by paragraph 6, and, since Rainbow was never given the opportunity to exercise the rights of first refusal, it was therefore Christmann who breached the contract.

The record reflects that initially appellee Christmann transferred a one-third interest in the farmout agreement to John Roden and a one-third interest to Vernon Delgado. Delgado then transferred his interest to Sublette Properties, Incorporated, and Roden transferred half of his interest to Roden Drilling Company with the other half to him and his wife jointly. Christmann also transferred a portion of his interest to his children. Thereafter, in 1979, appellee MGF Oil Corporation acquired the stock of Big Springs Exploration, Incorporated through a corporate merger and, in the process, acquired the Roden Drilling Company.

Rainbow contends that at least one of the above transfers constituted a sale and thus paragraph 6 was breached. In making these contentions, appellant does not, nor did it below, contest the initial transfer by Christmann to Roden and Delgado. The reason that Rainbow did not object to these transfers was that, prior to formation of the actual agreement, Cailliez was aware of and had in no way objected to the participation of Roden and Delgado. Nor does Rainbow Oil contest the transfer by Delgado to Sublette Properties, Incorporated since Delgado is the chief executive officer of that entity. However, Rainbow vigorously argues that the transfer by Roden to Roden Drilling constituted a sale as did the subsequent acquisition of that company by MGF Oil.

The trial court found that neither transfer was a sale and we agree.

We note initially that the question of whether or not clause 6 was breached by the questioned transfers depends upon the meaning that is assigned to the word "sell." This is so because the rights of first refusal which are reserved by the clause only come into play with respect to sales of the interests described in the farmout agreement.

In *Kroehnke v. Zimmerman,* 171 Colo. 365, 467 P.2d 265, 267 (1970) the court defined the term "sale" in the following manner:

"Although the corporation issued its stock and a note as consideration for the transfer of title, there is nothing in the record to suggest arms' length dealing between an owner willing (but not forced) to sell, and a buyer willing (but not forced) to buy, which customarily characterizes a sale in the open market."

A similar rule evolved in *McLeod v. Sandy Island Corporation,* 265 S.C. 1, 216 S.E.2d 746, 749 (1975) where the court, in distinguishing between a gift and a sale, said:

"A gift has been judicially defined as a voluntary transfer of property by one to another without any consideration or compensation therefor. [Citations omitted.]

"The chief distinction between a sale and a gift is that in the former a valuable consideration is necessary, whereas the latter need not rest for its support on any consideration or value. [Citations omitted.]"

It has also been said that the question which asks whether or not a transaction is a sale for the purpose of giving effect to a "first right of refusal" clause is not to be determined by the passing of consideration alone since the nature of the transaction must also be taken into account. *Isaacson v. First Security Bank of Utah,* 95 Idaho

452, 511 P.2d 269 (1973). These authorities establish a rule which holds that the term "sale" is to receive a narrower interpretation than is the term "transfer." See also: *Durkee v. Durkee-Mower, Inc.,* —— Mass. ——, 428 N.E.2d 139 (1981).

Given the above, we hold that the trial judge correctly decided that none of the transactions complained of violated the provisions of paragraph 6 of the agreement.

The uncontroverted testimony of appellee Margaret Roden [6] established that no consideration was received by John Roden for the transfer of one-half of his interest to Roden Drilling Company and it therefore follows that no sale took place. The record shows that John Roden recognized the need to transfer an interest in the lease to Roden Drilling Company in order to carry out his fiduciary obligations as president and chief executive officer of that company. *Voss Oil Company v. Voss,* Wyo., 367 P.2d 977 (1962). As to the subsequent acquisition of Big Springs Exploration by MGF Oil through corporate merger, we further find that this transfer did not constitute a sale of an interest in the lease. MGF Oil was not purchasing specific assets such as Roden Drilling Company's interest in the farmout agreement but rather it was simply a corporate stock acquisition transaction. Purchasing corporate stock does not constitute the purchase of a corporation's individual assets for any purpose with which we are here concerned *Cruising World, Inc. v. Westermeyer,* Fla.App., 351 So.2d 371 (1977).

With respect to Christmann's transfer of an overriding royalty to his children, that transfer is clearly a gift under the cases discussed above and all other relevant and applicable authority, and appellant does not strongly contend otherwise.

## DID THE COURT ERR IN DENYING REFORMATION?

At trial, the appellant contended that there were several material provisions of the contract that were omitted from the written agreement. The first provision, according to appellant, had to do with an "equal revenues" concept which held that appellant would not be required to relinquish control of "Old Rainbow" until the revenues being derived from "New Rainbow" equaled those from "Old Rainbow." Appellant's second assertion was that the parties intended the language "other accepted oil field operations" as utilized in paragraph 5 to include secondary recovery operations. In other words, appellant requested the trial court to reform the contract so that either Christmann was not entitled to control "Old Rainbow" since equal revenues had not yet been reached, or the 25–75% split would not be triggered until Christmann had undertaken and completed secondary recovery operations on "Old Rainbow." The trial court rejected these positions and we agree with that result.

Before a court may grant reformation of a written contract, the party requesting such relief must be able to establish that there was an agreement in which the parties had a meeting of the minds which was entered into prior to the written agreement, and that as a result of mutual mistake or fraud the written contract differs from the original agreement and omits certain agreed-to terms. *Pfister v. Brown,* Wyo., 498 P.2d 1243 (1972); *Russell v. Curran,* 66 Wyo. 173, 206 P.2d 1159 (1949). In the case at bar, as we have said, the contract is clear and unambiguous on its face, and was entered into only after careful negotiation had taken place. Nowhere in the agreement is there any reference to the so-called "equal revenues" idea nor does paragraph 5 provide, either in fact or by implication, for the undertaking of secondary recovery operations before the 25–75% share of the proceeds would go into effect. We hold that the appellant has failed to establish that the written contract did not embody the full agreement of the parties and therefore the trial court correctly denied the equitable remedy of reformation. It is hard to imagine that the parties would have intended the "equal revenues" concept or "secondary recovery" operations on "Old

---

**6.** John B. Roden had passed away prior to trial.

Rainbow" without including these provisions within the written language of the instrument. We will not rewrite contracts, and where a written agreement is clear and unambiguous parties must abide by the plainly stated terms. *McCartney v. Malm,* Wyo., 627 P.2d 1014 (1981); *Quin Blair Enterprises, Inc. v. Julien Construction Company,* supra. Reformation was and should have been denied.

## WAS SPECIFIC PERFORMANCE PROPERLY GRANTED?

Appellant's next contention questions the propriety of the trial judge's granting of specific performance in the appellees' favor. The contention is that appellees have behaved in ways that have the effect of precluding the granting of this equitable remedy. For instance, appellant alleges that appellees sat idly by while Rainbow Oil Company drilled two new wells on "Old Rainbow" and did not complain when the company undertook a program of reworking and modernizing several of the ten existing wells.

■ As a matter of law, specific performance will be granted in the discretion of the court only where there is a valid, binding contract and the facts and special equities of the situation demand such relief. *Reed v. Wadsworth,* Wyo., 553 P.2d 1024 (1976); *Merrill v. Rocky Mountain Cattle Co.,* 26 Wyo. 219, 181 P. 964 (1918). The party requesting specific performance must be able to establish that damages for breach are an inadequate and impractical remedy under the circumstances of the case. *Takahashi v. Pepper Tank & Contracting Company,* 58 Wyo. 330, 131 P.2d 339 (1942).

■ Here, the facts plainly establish the existence of a binding and valid contract and they also establish that the appellees were ready, willing and able to assume control of "Old Rainbow" at all times contemplated by the contract, and would have done so but for appellant's refusal to turn operations over to them. Also, it was established that appellee Christmann had completed the drilling program on "New Rainbow" in a prudent manner and to the satisfaction of appellant. Christmann then made timely demands on Rainbow for relinquishment of control of "Old Rainbow," which demands were refused. Given these circumstances, we find that the trial court properly concluded that specific performance was the proper remedy. No other relief would adequately transfer to Christmann that for which he bargained and which Rainbow Oil Company had agreed to convey. Appellant is correct in asserting that equity will not be available to one who has not acted in good faith and with due diligence, *Merrill v. Rocky Mountain Cattle Co.,* supra, but appellant has failed to establish how Christmann had not complied with his good-faith responsibilities or acted without the diligence required of him. He abided by the terms of the contract and is merely asking that appellant be required to do the same. The district court correctly decided that the granting of specific performance was necessary.

## DID THE COURT ERR IN ITS ACCOUNTING?

■ With respect to this contention, most of what we have said in our discussion of the second issue is relevant. We note this because Rainbow Oil Company again attempts to argue the "equal revenues" concept and the need for undertaking secondary recovery before the 25–75% share in the net proceeds should properly take effect. As far as we can determine, the only argument that merits attention concerns the propriety of the trial judge's finding that Christmann could and would have completed the reworking of the ten wells on "Old Rainbow" within 12 months in consequence of which the 25–75% provision would have taken effect during June of 1979—the starting date being June of 1978 when the drilling program on "New Rainbow" was completed.

This case was tried to the court and it is for the trial judge to weigh conflicting evidence and decide what inferences are to be drawn from the facts. *Colorado Builders Supply Co. v. National Fire Insurance Co.,* Wyo., 423 P.2d 79 (1967); *Johnson v. Aetna*

*Casualty and Surety Company of Hartford,* Wyo., 630 P.2d 514 (1981). The court's findings of fact will not be easily overturned, and then only in circumstances where there is a lack of competent evidence to support them. *Scott v. Elwood,* 77 Wyo., 428, 317 P.2d 513 (1957). From our review of the record, we are of the opinion that the trial court admirably performed the difficult task of sorting out the evidence in this complicated case and his efforts and conclusions are not subject to valid criticism. There was uncontroverted testimony that Christmann could have completed the work on "Old Rainbow" in a six-month period and the trial judge's decision to utilize a twelve-month time schedule is compatible with the evidence in the case.

As to other contentions made by appellant within the framework of this issue, we find them to be without merit and they will not be addressed. Our review of the record convinces us that the trial court seriously considered all of the pertinent testimony and came to the proper result. Appellant was compensated for any costs which it incurred in reworking "Old Rainbow" and it also received interest on the monies withheld by Christmann prior to the filing of this lawsuit. The accounting is approved in all respects.

## THE McKINLEY TWO–PERCENT OVERRIDE

■ The trial judge concluded that the two-percent overriding royalty granted to McKinley by paragraph 8 of the contract was to be paid out of proceeds derived from "Old Rainbow" and therefore Rainbow Oil Company's interest in the lease was burdened by this requirement. Appellant attacks this finding by noting that McKinley's testimony established that he believed Christmann was to pay him. His belief stemmed from an original understanding he had with Jeanne Cailliez concerning payment of his fees for finding a buyer for the lease. It seems that this agreement provided that McKinley would negotiate with a prospective purchaser for payment of his fees, and that Rainbow Oil would not be responsible for this payment. McKinley

therefore testified that he assumed the same payment scheme would apply to the farmout agreement—at least he said he had no reason to believe otherwise. Notwithstanding this, McKinley also admitted that he was not involved in the negotiations that later occurred between Rainbow Oil Company and Christmann on the issue of his fee payment. These negotiations resulted in the written agreement which provides:

"It is agreed by all of the parties hereto that Mr. Stuart M. McKinley or Barbara C. McKinley is to receive an overriding royalty of 2% for Mr. McKinley's services in consummation of this agreement."

Even though the provision does not say who is to pay, it certainly does not provide that Rainbow Oil Company's interest is not to be burdened by McKinley's royalty. While the provision does not include any reference to the fact that payment is to come out of the gross proceeds derived from "Old Rainbow," when we take into account the fact that at the time the parties entered into their agreement, the only extant production was that which was being derived from the existing wells on "Old Rainbow," it seems obvious that this must have been the intent of the parties. It is therefore reasonable for the trial court and for us to conclude that the parties must have intended "Old Rainbow" would be burdened by the override. We fail to see the relevance of McKinley's testimony with respect to ascertaining the intent of the parties as set out in paragraph 8 of the contract. We therefore agree with the holding of the trial court on this issue.

## REFUSAL TO ACCEPT OFFERED EVIDENCE

■ At trial appellant's attorney attempted to read portions of John Christmann's deposition into evidence, while Christmann was present in the courtroom. The trial judge refused the request and the appellant now urges this refusal as error. In making this argument, Rainbow Oil Company relies on Rule 32(a)(2), W.R.C.P. and Rule 801(d)(2), W.R.E. Rule 32(a)(2), W.R.C.P. provides:

"(a) Use of depositions.—At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness *were then present* and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

"(2) The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, or managing agent, or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a public or private corporation, partnership or association or governmental agency which is a party may be used by an adverse party for any purpose;"

Rule 801(d)(2), W.R.E. provides:

"(d) Statements which are not hearsay. —A statement is not hearsay if:

"(2) Admission by Party-Opponent.—The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity, or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

The record reflects that Mr. Christmann's deposition was utilized thoroughly by appellant during cross-examination of that witness, and we find that appellant's subsequent attempt to read that same testimony into evidence is totally outside the scope of either of the above-quoted rules. Rule 32(a)(2), W.R.C.P. contemplates the reading of a deposition into evidence only in circumstances where the witness is not present. In circumstances where the witness is present, the deposition can be used for impeachment purposes by inquiring about inconsistent answers given at an earlier time. Here, as just discussed, appellant had ample opportunity and did utilize the deposition to its fullest authorized extent.

## CONCLUSION

We conclude, in light of our previous discussion, that the trial court must be affirmed in all respects. The appellant entered into a valid and binding contract with appellee Christmann and has, for various reasons, attempted to ignore or circumvent its obligations under that agreement. Whether the contract represented a good or bad deal for appellant is not a matter for our concern. The written contract was valid, legally enforceable and freely entered into by both the appellant and the appellee.

The trial judge did an admirable job in correctly sorting his way through difficult and complex factual and legal problems.

Affirmed.